**In re DREXEL BURNHAM LAMBERT GROUP INC., et al., Debtor.**

**Bankruptcy No. 90 B 10421 (FGC).**

United States Bankruptcy Court,
S.D. New York.

March 9, 1992.

C. Ball, P. Gruenberger, P. Leake, A. Miller, J.J. Rapisardi, T. Schneider, H. Spierer, Weil, Gotshal & Manges, New York City, for Drexel Burnham Lambert Group, Inc., et al.

D. Brand, M. Guss, M.S. Kirschner, Jones, Day, Reavis & Pogue, New York City, for Official Committee of Unsecured Creditors of Drexel Burnham Lambert Group, Inc.

D. Dillon, M.F. Witkin, C.D. Montgomery, Milgrim Thomajan & Lee, P.C., New York City, for Official Committee of Equity Interest Holders of Drexel Burnham Lambert Group, Inc.

O. Lewis, Davis Polk & Wardell, New York City, for Official Committee of Unsecured Creditor of Drexel Burnham Lambert Trading Corp.

M. Zelmanovitz, Zalkin, Rodin & Goodman, New York City, for Official Committee of Unsecured Creditors of Drexel Burnham Lambert Inc.

G. Wailand, Cahill, Gordon & Reindel, New York City, special counsel for Drexel Burnham Lambert Group, Inc.

N. Bartolino, M. Flumenbaum, A.W. Kornberg, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Michael R. Milken.

D. Eaton, Kirkland & Ellis, New York City, for Nat. Bank of Yugoslavia.

J.J. Jerome, Milbank, Tweed, Hadley & McCloy, New York City, for Nissho Iwai Corp.

J. North, Cravath, Swaine & Moore, New York City, for Federal Deposit Ins. Corp. and the Resolution Trust Corp.

P. Goodman, S. Hirshon, Proskauer Rose Goetz & Mendelsohn, New York City, for Subcommittee of Subordinated Debt Holders.

D.J. O'Brien, Eckert Seamans Cherin & Mellott, Pittsburgh, Pa., for Liggett Group and Liquid Green Trust.

W.W. Kannel, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Mass., for Hart Holding Co. and Reeves Industries, Inc.

M.I. Klein, Dreyer and Traub, New York City, co-counsel for Michael R. Milken.

D. Berger, Philadelphia, Pa., S. Nesmer, Wolf Popper Ross Wolf & Jones, New York City, for Plan Proponent Sub Class B.

M. Brosterman, M. Goldstein, Stroock, Stroock & Lavan, New York City, for Robert Rubin and Barry Stein.

A.J. Levander, Shereff Friedman Hoffman & Goodman, New York City, for Paul Higbee, et al.

## MEMORANDUM OF DECISION ON PLAN CONFIRMATION

FRANCIS G. CONRAD,* Bankruptcy Judge.

### TABLE OF CONTENTS

Page
PRELIMINARY MATTERS ... 727
FINDINGS OF FACT ... 728
I. Background ... 728
II. Critical Components of the Plan ... 730
III. Classification, Designation, Treatment and Voting of Claims ... 730
IV. Entities under the Plan and Plan Securities ... 732
A. The Trust and Its Liquidating Subsidiary, DBP Corp. ... 733
B. New Street Capital Corporation ... 734
C. DPI, DPI–A Corp. and DPI–B Corp. ... 736
D. The Pooled Contingent Assets ... 737
E. The Securities Litigation Settlement Funds ... 737

* Sitting by Special Designation.

Page

V. Plan Modification.............................................737
VI. Distributions ...............................................738
 A. Projected Recoveries Under the Plan .............................738
 B. Distributions Mechanisms Under the Plan .........................738
 1. Trust Distributions .........................................738
 2. DPI Distributions ..........................................739
 3. Distributions for Allowed Administrative/Tax Claims and Disputed Claims and Contested Claims and Enforceable Claims....739
 4. Reserves .................................................740
 5. Escrows .................................................740

VII. Substantive Consolidation .......................................741
VIII. Settlements In the Plan .........................................744
 A. Securities Litigation Claims Settlement............................745
 B. Intercompany Settlement ......................................746
 C. DBL Group Guaranty Holder Settlement ..........................747
 D. Employee ERISA/Compensation Claims Settlement .................748
 E. DBL Trading Pro Rata Settlement................................750

IX. Best Interests Test...............................................751
X. Conditions Precedent ...........................................753
XI. Miscellaneous .................................................753
 A. Release and Injunction Provisions...............................753
 B. Executory Contracts ..........................................754
 C. Profit Sharing Plan and Stock Bonus Plan .........................754

OBJECTIONS .......................................................754
DISCUSSION .......................................................757
 I. Section 1122(a) ...........................................757
 II. Section 1123 .............................................758
 III. Section 1129(a)(2) .........................................759
 IV. Section 1129(a)(3) .........................................759
 V. Section 1129(a)(4) .........................................760
 VI. Section 1129(a)(5) .........................................760
 VII. Section 1129(a)(6) .........................................760
 VIII. Section 1129(a)(7) .........................................760
 IX. Sections 1129(a)(8) and 1129(b) ..............................761
 X. Section 1129(a)(9) .........................................761
 XI. Section 1129(a)(10) ........................................761
 XII. Section 1129(a)(11)........................................762
 XIII. Section 1129(a)(12) ........................................763
 XIV. Section 1129(a)(13) ........................................763
 XV. Substantive Consolidation ...................................763
CONCLUSIONS OF LAW ..............................................767
 I. The Plan Satisfies the Requirements of Section 1123(a)(1) of the Bankruptcy Code.................................................767
 II. The Plan Satisfies the Requirements of Section 1122(a) of the Bankruptcy Code.................................................767
 III. The Plan Satisfies the Requirements of Section 1123(a)(2) of the Bankruptcy Code.................................................767
 IV. The Plan Satisfies the Requirements of Section 1123(a)(3) of the Bankruptcy Code.................................................767
 V. The Plan Satisfies the Requirements of Section 1123(a)(4) of the Bankruptcy Code.................................................767
 VI. The Plan Satisfies the Requirements of Section 1123(a)(5) of the Bankruptcy Code.................................................767
 VII. The Plan Satisfies the Requirements of Section 1123(a)(6) of the Bankruptcy Code.................................................768
 VIII. The Plan Satisfies the Requirements of Section 1123(a)(7) of the Bankruptcy Code.................................................768

Page

IX. The Rejection of Executory Contracts and Unexpired Leases Pursuant to Section 1123(b)(2) of the Bankruptcy Code Is in the Best Interests of the Debtors' Estates................................................... 768

X. All Settlements and Compromises Incorporated in the Plan Pursuant to Section 1123(b)(3) Are Reasonable, Fair and Equitable and in the Best Interests of the Debtors' Estates .............................. 768

XI. The Distribution of Plan Securities Is Exempt from Any Applicable Registration Requirements Pursuant to Section 1145 of the Bankruptcy Code....................................................... 769

XII. The Distribution of Plan Securities Is Governed by the Exemption Provided in Section 1146(c) of the Bankruptcy Code ................. 769

XIII. The Plan Satisfies the Requirements of Section 1129(a)(1) of the Bankruptcy Code....................................................... 769

XIV. The Plan Proponents Have Satisfied the Requirements of Section 1129(a)(2) of the Bankruptcy Code ................................... 769

XV. The Plan Satisfies the Requirements of Section 1129(a)(3) of the Bankruptcy Code....................................................... 769

XVI. The Plan Satisfies the Requirements of Section 1129(a)(4) of the Bankruptcy Code....................................................... 770

XVII. The Plan Satisfies the Requirements of Section 1129(a)(5) of the Bankruptcy Code....................................................... 770

XVIII. Section 1129(a)(6) of the Bankruptcy Code Is Not Applicable to the Plan.... 770

XIX. The Plan Satisfies the Requirements of Section 1129(a)(7) of the Bankruptcy Code....................................................... 770

XX. The Plan Satisfies the Requirements of Section 1129(a)(8) of the Bankruptcy Code....................................................... 771

XXI. The Plan Satisfies the Requirements of Section 1129(a)(9) of the Bankruptcy Code....................................................... 771

XXII. The Plan Satisfies the Requirements of Section 1129(a)(10) of the Bankruptcy Code ...................................................... 771

XXIII. The Plan Satisfies the Requirements of Section 1129(a)(11) of the Bankruptcy Code ...................................................... 772

XXIV. The Plan Satisfies the Requirements of Section 1129(a)(12) of the Bankruptcy Code ...................................................... 772

XXV. The Plan Satisfies the Requirements of Section 1129(a)(13) of the Bankruptcy Code ...................................................... 772

XXVI. The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code....................................................... 772

XXVII. The Plan Satisfies the Requirements of Section 1129(d) of the Bankruptcy Code....................................................... 772

XXVIII. The Release and Injunction Provisions of the Plan Are Consistent with §§ 105, 524(e), 1123(a)(5), 1129 and Other Applicable Provisions of the Bankruptcy Code .............................................. 772

XXIX. Substantive Consolidation .............................................. 773

---

<<<PRELIMINARY MATTERS>>>

On March 5, 1992, we held [1] a confirmation hearing on the *Second Amended and* *Restated Joint Plan of Reorganization* (Plan),[2] dated March 5, 1992, *for the Debtors Under Chapter 11 of the United*

**1.** Our subject matter jurisdiction over these cases arises under 28 U.S.C. § 1334(b) and the Order, dated February 19, 1991 (Pollack, S.D.J.), which withdrew the reference to this Court under 28 U.S.C. § 157(d) and 11 U.S.C. § 105(a), and simultaneously re-referred to us jurisdiction over all core and non-core related matters. This is a core matter under 28 U.S.C. § 157(b)(2)(A) and (L). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable by F.R.Bkrtcy.P. 7052.

**2.** Capitalized terms used in this Memorandum of Decision that are not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

*States Bankruptcy Code,* proposed by The Drexel Burnham Lambert Group, Inc. (DBL Group), Drexel Burnham Lambert, Incorporated (DBL Inc.), BRR, Incorporated (BRR), Deauville United Corporation (Deauville), Double Oil & Gas, Incorporated (Double Oil & Gas), Drexel Burnham Lambert (Asia) Ltd. (DBL Asia), Drexel Burnham Lambert C.P., Inc. (DBL C.P.), Drexel Burnham Lambert Capital Group, Inc. (DBL Capital Group), Drexel Burnham Lambert International, Incorporated (DBL International), Drexel Burnham Lambert Caribe International, Incorporated (DBL Caribe), Drexel Burnham Lambert Commercial Paper, Incorporated (DBL Commercial Paper), Drexel Burnham Lambert Investors Corp. (DBL Investors), Drexel Burnham Lambert MBI Corp. (DBL MBI), Drexel Burnham Lambert Products Corp. (DBL Products), Drexel Investment Holdings, Inc. (Holdings), Drexel Burnham Lambert Trading Corporation (DBL Trading), and Drexel Burnham Lambert Government Securities, Inc. (DBL GSI), certain of the above-captioned debtors (collectively, the Debtors), and other Plan Proponents.

We have reviewed and considered the Plan; the affidavit of John F. Sorte, dated February 28, 1992, the affidavits of Richard J. Wright, dated February 28, 1992 and March 4, 1992, the affidavits of Peter Gruenberger, dated December 20, 1991 and February 28, 1992 (Gruenberger Affidavits I and II, respectively), the affidavit of John Stevenson, an officer of Georgeson & Company, dated February 28, 1992, and the affidavit of William B. Masi, an officer of Independent Election Corporation of America, dated March 3, 1992; the *Joint Statement of Plan Proponents in Support of the First Amended and Restated Joint Plan of Reorganization For the Debtors Under Chapter 11 of the United States Bankruptcy Code,* dated March 4, 1992; as well as the testimony proffered and adduced, the exhibits admitted into evidence at the hearing, and the arguments of counsel presented at the hearing. We have also considered and disposed of all objections to confirmation of the Plan, either prior to the hearing or at the hearing.

This Court is cognizant of the Plan, the compromises and settlements of the parties, and other relevant factors affecting these Chapter 11 Cases, and takes judicial notice of the entire record.

<<<FINDINGS OF FACT>>>

I.

Background

On February 13, 1990, DBL Group filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

On February 27, 1990, the United States Trustee for the Southern District of New York appointed a Committee of Unsecured Creditors in the DBL Group Chapter 11 case under § 1102(a) of the Bankruptcy Code. [DBL Group Docket Nos. 54, 388, and 1879].

The United States Trustee also appointed a Committee of Equity Security Holders in the DBL Group Chapter 11 case under §§ 1102(b)(1) and (2) of the Bankruptcy Code. [DBL Group Docket No. 158].

By orders dated May 10, 1990 and May 18, 1990, under § 706(a) of the Bankruptcy Code, DBL Trading and DBL Trade Finance, each a wholly-owned subsidiary of DBL Group, converted their involuntary Chapter 7 petitions to voluntary Chapter 11 cases. An order for relief under Chapter 11 was entered in each case. [DBL Trading Docket No. 3; Order, dated May 18, 1990; DBL Trading Finance Docket No. 3].

A Committee of Unsecured Creditors in the DBL Trading Chapter 11 case was appointed. [DBL Trading Docket No. 12].

On May 29, 1990, DBL Inc. and 14 of its affiliates, direct or indirect subsidiaries of DBL Group, each filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

On June 12, 1990, a Committee of Unsecured Creditors in the DBL Entities' Chapter 11 cases (the "DBL Inc. Creditors' Committee") was appointed [DBL Inc. Docket No. 22 and DBL Group Docket Nos. 359 and 387].

On June 20, 1990, DBL GSI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

No trustee has been appointed in any of these Chapter 11 cases.

By order dated June 20, 1990, the Debtors' Chapter 11 cases were consolidated for procedural purposes only under F.R.Bkrtcy.P. 1015(b). [DBL Group Docket No. 308].

On the DBL Group Petition Date, Drexel had trading capabilities in domestic and international securities, income, equity and interest-rate products, commodities and currencies, and provided complete investment banking services to its clients and customers.

Drexel, which was controlled through its holding company, DBL Group, and known as Drexel Burnham Lambert, included:

(a) operating companies, such as DBL Inc., a registered broker-dealer, DBL GSI, a registered U.S. Government securities dealer, DBL Products, an interest swap company, and DBL Trading, a commodity trading operation;

(b) special purpose finance companies formed to raise capital for Drexel, such as corporations used in structured finance transactions; and,

(c) investment companies that were not subject to broker-dealer registration or other regulatory requirements, and could hold assets outside the regulatory environment. [Affidavit of Richard J. Wright, dated February 28, 1992, Debtors' Ex. 2 (Wright Affidavit) at ¶ 4].

The Debtors and the Committees, together with FDIC, RTC, and Milberg Weiss Bershad Specthrie & Lerach, as representatives and on behalf of the Pooling Securities Litigation Claimants, and each of David Berger, Esq. of Berger & Montague, P.C. and Stanley Nemser, Esq. of Wolf, Popper, Ross & Jones, lead liaison counsel for the class and shareholder plaintiffs in consolidated multi-district class and derivative actions known as MDL 732, as representatives of and on behalf of the Other Securities Litigation Claimants, are the proponents of the Plan. The Plan was filed by the Plan Proponents on August 7, 1991, amended and restated on December 20,

1991, and again modified on March 5, 1992. [Affidavit of John F. Sorte, dated February 28, 1992; Debtors' Ex. 1 (Sorte Affidavit) at ¶ 8; Wright Affidavit, dated March 4, 1992 at ¶¶ 2–5].

The Disclosure Statement was filed by the Debtors on October 25, 1991, and amended and restated on December 20, 1991.

On December 20, 1991, after hearings held on November 21, 1991, December 5, 1991, December 19, 1991, and December 20, 1991, we determined that (a) sufficient and timely notice of the hearings was given in accordance with the Bankruptcy Rules, and (b) the Disclosure Statement, including cover letters to the Disclosure Statement from the Debtors and from the Committees to their respective constituencies (the "Letters"), contained "adequate information" under § 1125 of the Bankruptcy Code. On the same date, we issued an order approving the Disclosure Statement. [DBL Group Docket No. 3573].

Our order approving the Disclosure Statement authorized and directed the Debtors to serve, by January 10, 1992, a copy of the Plan, the Disclosure Statement, together with all exhibits and attachments thereto, copies of the Letters, a copy of the order approving the Disclosure Statement (without exhibits), and the appropriate ballot(s) on all pertinent parties.

Under the Plan, all Equity Interests, are in classes that are impaired under the Plan. [Plan, Article III]. The Disclosure Statement order established December 20, 1991 as the date for determining the Equity Interest holders entitled to vote to accept or reject the Plan. [DBL Group Docket No. 3573].

Additionally, the order required the Debtors to provide notice by publication of the approval of the Disclosure Statement, the time and place of the Confirmation Hearing, the time and date by which all objections to confirmation of the Plan must be served and filed with the Court, and certain other information contained in the form of notice attached as an exhibit to the order approving the Disclosure Statement. The notice was required to be published twice in 31 domestic publications and 16

international publications, on dates that were at least three business days apart, on or before February 5, 1992.

The order approving the Disclosure Statement fixed February 27, 1992 at 5:00 p.m. E.S.T. as the time and date by which all ballots must be completed, executed, marked, and received by the Debtors' vote tabulating agent, Independent Election Corporation of America, to be counted as acceptances or rejections of the Plan.

March 5 and 6, 1992, at 9:30 a.m., was set as the time and date for the Confirmation Hearing. Other hearing dates were established prior to March 5, 1992 to hear substantial objections to the Plan.

The Disclosure Statement order established that, in the event confirmation of the Plan was denied, we would recharacterize the Confirmation Hearing as a hearing to consider conversion of the Debtors' Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code. This recharacterized hearing would be necessary because there was no real alternative to reorganization in this case.

On January 10, 1992, the Debtors mailed over 8,000 Ballot Solicitation Packages to the parties designated in the Order approving the Disclosure Statement. Additionally, by order dated February 14, 1992, we authorized the mailing of about 850 Ballots to certain Creditors holding DBL Group Class 6C Claims, which mailing occurred on January 31, 1992. [DBL Group Docket No. 4135].

The order approving the Disclosure Statement authorized the appointment of a valuation agent and a tabulating agent.

## II.

### Critical Components of the Plan

The Plan is dependent upon the following critical components:

(a) the identification and settlement of the Securities Litigation Claims as set forth in the Claims Agreement, which settlement dedicates a substantial portion of the estates of the Debtors to the full satisfaction of the Securities Litigation Claims;

(b) a substantive consolidation of DBL Group, BRR, Deauville, Double Oil & Gas, DBL C.P., DBL Investors, DBL MBI, DBL Holdings, DBL GSI, DBL Products, DBL Commercial Paper, and DBL Capital Group;

(c) a substantive consolidation of DBL Inc., DBL Asia, DBL International, and DBL Caribe;

(d) an intercompany settlement by and among DBL Group, as substantively consolidated, DBL Inc., as substantively consolidated, and DBL Trading, which, intercompany settlement, among other things, incorporates: (1) a settlement of the guaranty Claims against DBL Group on account of Claims against DBL Inc. and DBL Trading, and (2) settlements of various employee-related compensation Claims against DBL Inc. and DBL Group; and,

(e) the implementation and effectuation of the foregoing through the pooling and merger of all assets of the Debtors into DBL Group, and from there into the various entities created under the Plan, notably the Trust, New Street, and DPI, the issuance by such Plan Entities of various Plan Securities in full settlement, satisfaction, and discharge of all Claims against, and Equity Interests in, DBL Inc., DBL Group, and DBL Trading. [Plan, Article II].

Our findings on the many and complex factors specific to the substantive consolidations into DBL Group and DBL Inc., the Claims Agreement, the Intercompany Settlement, the DBL Group Guaranty Settlement, and the various Employee ERISA/Compensation Claims Settlements are set forth below.

## III.

### Classification, Designation, Treatment, and Voting of Claims under the Plan

The Plan provides that Administrative Claims and Convenience Claims against the Debtors, as well as the Debtors' Drexel Civil Disgorgement Fund Obligation will all be fully paid in cash upon Consummation. Holders of Tax Claims will be paid in installments over a period of six years, and

will receive the statutory rate of interest for deficiencies under applicable state and local tax laws on the Allowed Amount of their Claims, from the Consummation Date until such Claims are paid in full, unless any such holder has agreed to a different treatment. [Plan, §§ 3.1, 3.2, 3.3 and 3.4].

Under the Plan, DBL Inc., DBL Caribe, DBL Asia, and DBL International are substantively consolidated. Creditors of DBL Inc. and, to the extent there are any, Creditors of DBL Caribe, DBL International, and DBL Asia (DBL Inc. Consolidating Subsidiaries) are treated as creditors holding Claims against DBL Inc. [Sorte Aff. ¶¶ 13, 15]. No guarantees by or among DBL Inc. and any of the DBL Inc. Consolidating Subsidiaries of Claims held by Creditors of DBL Inc. or of any of the DBL Inc. Consolidating Subsidiaries will be recognized. Such Claims against DBL Inc. have been classified under the Plan as follows:

DBL Inc. Class 1A – Priority Claims
DBL Inc. Class 1B – Customer Claims
DBL Inc. Class 1C – Retiree Benefits Claims
DBL Inc. Class 2 – Securities Litigation Claims
DBL Inc. Class 3 – Secured Claims
DBL Inc. Class 4 – Unsecured Claims other than Claims in DBL Inc. Class 5, 6, 7A and 7B and Intercompany Claims
DBL Inc. Class 5 – Regulatory/Penalty Claims
DBL Inc. Class 6 – DBL Inc. Senior Subordinated Claims
DBL Inc. Class 7A – DBL Inc. Junior Subordinated Claims held by holders of DBL Group Guaranty Claims
DBL Inc. Class 7B – DBL Inc. Junior Subordinated Claims other than Claims in DBL Inc. Class 7A

[Plan, § 4.2; Sorte Aff. ¶ 140].

---

DBL Group, DBL Capital Group, DBL GSI, DBL Products, DBL Commercial Paper, BRR, Deauville, Double Oil & Gas, DBL C.P., DBL Investors, DBL MBI, and Holdings are substantively consolidated under the Plan. [Sorte Aff. ¶ 14]. Creditors of DBL Group and, to the extent there are any, Creditors of BRR, Deauville, Double Oil & Gas, DBL C.P., DBL Investors, DBL MBI, Holdings, DBL Capital Group, DBL GSI, DBL Products, and DBL Commercial Paper (collectively, the "DBL Group Consolidating Subsidiaries") are treated as Creditors holding Claims against DBL Group. [*Id.* at ¶ 16]. No guarantees by or among DBL Group and any of the DBL Group Consolidating Subsidiaries of Claims of Creditors of DBL Group or any of the DBL Group Consolidating Subsidiaries will be recognized. Such Claims against DBL Group have been classified under the Plan as follows:

DBL Group Class 1 – Priority Claims
DBL Group Class 2 – Securities Litigation Claims
DBL Group Class 3 – Secured Claims
DBL Group Class 4 – Unsecured Claims against DBL Group Consolidated other than Claims in DBL Classes 5A, 5B, 6A, 6B and 6C and intercompany Claims
DBL Group Class 5A – DBL Group Guaranty Claims held by holders of DBL Trading Class 3 Claims
DBL Group Class 5B – DBL Group Guaranty Claims held by holders of DBL Inc. Classes 6 and 7A Claims
DBL Group Class 6A – DBL Group Redemption/ERISA Claims
DBL Group Class 6B – DBL Group Subordinated Debt/ERISA Claims
DBL Group Class 6C – DBL Group Shareholder/ERISA Compensation Claims

The Equity Interests in DBL Group have been classified as follows:

DBL Group Class 7 – Preferred Stock Equity Interests
DBL Group Class 8 – LBA Equity Interests
DBL Group Class 9 – All Other Equity Interests in DBL Group

[Plan, § 4.1; Sorte Aff. ¶ 140].

Under the Plan, Claims against DBL Trading have been classified as follows:

DBL Trading Class 1 – Priority Claims
DBL Trading Class 2 – Securities Litigation Claims
DBL Trading Class 3 – Unsecured Claims against DBL Trading, excluding Intercompany Claims

[Plan, § 4.3; Sorte Aff. ¶ 140].

The claims or interests in each class of Claims or Equity Interests under the Plan are substantially similar to the other claims or interests in the same class. [Plan, Article IV; Sorte Aff. ¶ 142].

The Plan provides that Convenience Claims will be paid in full, in cash, on the Consummation Date of the Plan. Allowed Claims in each of DBL Group Classes 1 and 3; DBL Inc. Classes 1A, 1B, 1C, and 3; and DBL Trading Class 1 will also be paid and/or provided for in full, in cash, upon Consummation. [Plan, §§ 6.1, 6.3, 7.1, 7.2, 7.3, 7.5 and 8.1].

The legal and equitable rights and entitlements of the Securities Litigation Claimants, consisting of DBL Group Class 2, DBL Inc. Class 2, and DBL Trading Class 3, are set forth in the Claims Agreement. [Claims Agreement, § 2.1]. The Securities Litigation Claimants were found by this Court and the District Court to be unimpaired, in Findings of Fact and Conclusions of Law entered on August 9, 1991, because the Plan provides the Securities Litigation Claimants with the legal rights and entitlements that are set forth in the

Claims Agreement. [DBL Group Docket Nos. 2707 and 2734, respectively; Plan §§ 6.2, 7.4 and 8.2].

None of DBL Group Classes 4, 5A, 5B, 6A, 6B and 6C; DBL Inc. Classes 4, 5, 7A and 7B; and DBL Trading Class 3 (Impaired Classes of Claims) will be paid or provided for in full on the Consummation Date of the Plan. Rather, each has been designated an impaired class, and will receive various Plan Securities. [Plan Articles IV, V, VI, VII and VIII].

None of the Equity Interests in DBL Group Classes 7, 8 and 9 (Impaired Classes of Interests) will receive any liquidation preference or redemption price, or retain any equity positions. Each has been designated an impaired class, and may, with the exception of DBL Group Class 8, receive New Street Warrants.[3] [Plan Articles IV, V and VI].

All classes overwhelmingly voted to accept the Plan, with the exception of DBL Group Class 8. [Affidavit of William B. Masi, an officer of Independent Election Corporation of America, dated March 3, 1992, Debtors' Ex. 7].

3. *See, In re Drexel Burnham Lambert Group, Inc., et al.,* 138 B.R. 714 (Bkrtcy.D.Vt.1992), "Memorandum of Decision on § 1129(b) Objections to Plan Confirmation," slip op. dated March 4, 1992 (Conrad, J.).

## IV.

### Entities under the Plan and Plan Securities

The following entities or funds will be established under the Plan:

(a) the Trust, a liquidating trust formed to marshal, liquidate and distribute the Trust Assets to certain Creditors in accordance with the Plan, together with its two wholly-owned subsidiaries:

(1) New Street Capital Corporation (New Street), the ongoing reorganized company that is to be successor to DBL Group; and,

(2) DBP Corp., a special purpose corporation formed to hold and liquidate the Drexel Business Partnerships for the benefit of the Trust;

(b) DPI, a limited partnership formed to hold and liquidate the Drexel Partnership Interests and distribute the net proceeds of the Drexel Partnership Interests to certain Creditors that will own the DPI limited partnership interests either directly or indirectly, through one of two corporations formed to hold such limited partnership interests:

(1) DPI–A Corp.; and,

(2) DPI–B Corp.;

(c) DPI G.P. Corp., the general partner of DPI; and,

(d) the Securities Litigation Settlement Funds, established to receive the Plan Securities and distributions designated for the Securities Litigation Claimants.

Certain contingent assets of the Debtors and certain claims of the Pooling Securities Litigation Claimants are to be prosecuted by the Pool Administrators for the benefit of the Creditors in accordance with the Plan. In addition, the Trust will establish and maintain certain escrows and reserves that are required under the Plan. [Plan Article X; Sorte Aff. ¶ 18].

The assets of the Debtors, other than the assets to remain in New Street (New Street Assets), will be transferred according to Article X of the Plan for the account of the creditors entitled to them, in satisfaction of all Claims against the Debtors. [*Id.* at 19].

DBL Group will retain the New Street Assets, and be reorganized into New Street, which will issue all of its outstanding shares of common stock to the Trust, thus becoming a wholly-owned, operating subsidiary of the Trust. [Plan § 10.3; Sorte Aff. ¶¶ 20, 40, 46]. All DBL Group Equity Interests will be canceled on Consummation. [Sorte Aff. ¶ 45].

## A.

### *The Trust and Its Liquidating Subsidiary, DBP Corp.*

The Trust will own and hold; the Drexel Business Partnerships, the New Street Stock and DBP Corp. Interests, the Trust's interest in the Pooled Contingent Assets (Trust PCA Recovery), the DPI Note, any assets deposited in or transferred to or earned by the Trust (Trust Assets), and all of the Debtors' assets *except* the Debtors' Contributed Contingent Assets, the New Street Assets, the Drexel Partnership Interests. [Plan, § 10.1; Sorte Aff. ¶ 22].

The purpose of the Trust and the responsibilities of the Trustees are to: marshal, liquidate, and distribute the Trust Assets in an expeditious orderly manner; object to, litigate, settle and resolve issues with respect to Disputed Claims and Contested Claims; maintain the various reserves that are required by the Plan as part of the Trust; and administer and hold various escrows required by the Plan. [Plan, §§ 10.1.5, 10.1.6; Sorte Aff. ¶¶ 24, 25].

All of the issued and outstanding stock of DBP Corp. will be voting stock that is wholly-owned by the Trust. One of the Trustees will serve as the sole director of DBP Corp. The primary purpose of DBP Corp. will be to hold, manage, liquidate and distribute, in an orderly manner, the Debtors' interests in the Drexel Business Partnerships for the benefit of the Trust. DBL Corp. shall distribute all net proceeds realized as a result of its activities to the Trust. [Plan, § 10.4; Sorte Aff. ¶¶ 90–94].

Undivided participating interests in the Trust will be distributed to certain Creditors under the Plan as Trust beneficiaries. Interests in the Trust will be issued in three major types of certificates of beneficial interest or "CBIs." They are called "CBI–A's", "CBI–B's" and "CBI–C's."

(a) CBI–A's will be issued under the Plan to holders of Allowed Unsecured Claims, holders of DBL Group Classes 6A, 6B and 6C Claims that are Enforceable Claims (collectively, with the holders of Allowed Unsecured Claims, the "Fixed Creditors"), the DBL Inc. Escrow, the ERISA Escrow and the Disputed Unsecured Claims Escrow (including the Milken Escrow), (collectively, all such escrows are referred to herein as the "Fixed Creditor Escrows");

(b) 3,200 CBI–B's will be issued pursuant to the Plan to Securities Litigation Settlement Fund A and Securities Litigation Settlement Fund B for the account of Securities Litigation Claimants; and

(c) CBI–C's will be issued under the Plan to the Fixed Creditors (other than holders of Enforceable Claims in DBL Group Class 6A) and the Fixed Creditor Escrows.

[Plan, § 10.1.3; Sorte Aff. ¶¶ 26–29]

The initial Trustees of the Trust will be Messrs. George D. Gould, Robert P. Rittereiser, and Paul T. Walker. [Sorte Aff. ¶ 30]. The Trustees will also serve as the escrow agents of the Fixed Creditor Escrows. [Id. at ¶ 32].

The compensation of the Trustees is comprised of two components: base salary and incentive compensation. All three Trustees will be paid a total of $950,000 as base salary for each year of the first four years of the life of the Trust. To the extent that the life of the Trust extends beyond the fourth year, all three Trustees will receive total base salary at the annual rate of $800,000 for the fifth year, $650,000 for the sixth year, $500,000 for the seventh year, and $350,000 for each of the eighth through tenth years. Division of the total base salary among the Trustees is subject to an agreement of allocation among them.

The incentive compensation component of the Trustees' compensation will be divided into two elements based upon (1) the timing and amount of distributions on CBI–A's, and (2) the timing of liquidation and amount of distributions of the assets of the Trust. All incentive payments are to be allocated among the Trustees in equal amounts. [Id. at ¶¶ 35–37].

Each Trustee shall serve for the duration of the Trust, subject to the earlier of death, resignation or removal. [Id. at ¶ 38].

The Trust will terminate upon the earlier of (1) the date on which all Disputed Unsecured Claims, all Contested Claims and all Claims on behalf of the Trust have been resolved, all assets have been liquidated, reduced to cash and distributed, and the Trustees certify that the purposes of the Trust have been fulfilled, or (2) the fourth Anniversary unless, for cause shown, the Bankruptcy Court permits the Trust to continue for no more than three additional two-year periods. [Plan, § 10.1.15; Sorte Aff. ¶ 39].

## B.

### New Street Capital Corporation

New Street will be the reorganized, operating DBL Group. [Plan, § 10.3.1; Sorte Aff. ¶ 40]. New Street will be a special purpose merchant bank. New Street's business will include: managing its securities portfolio; influencing the terms of any recapitalization or reorganization plan of an issuer of securities held by New Street; investing in particular portfolio companies with a view, through strategic investor alliances, to acquiring a control position in the equity securities of a newly reorganized company and/or otherwise participating in the affairs of portfolio companies; offering financial advisory services to companies with regard to restructuring matters; and, engaging in a limited amount of trading in securities (principally high yield debt) for its own account, through a wholly-owned subsidiary to be registered as a broker-dealer. [Plan, § 10.3.3; Sorte Aff. at ¶ 41].

The New Street Assets have been designated by the Debtors and agreed to by the Plan Proponents, and consist of certain securities positions and Cash, which securities and Cash are estimated to have a fair market value, as of February 14, 1992, of $415 million.

All of the capital stock of DBL Group which is then issued and outstanding will be cancelled. [Plan, § 11.1.10.g; Sorte Aff. ¶ 45]. Under the amended restated charter of DBL Group, all equity securities will be voting securities having proportionate vot-

ing. All outstanding stock of New Street will be issued to the Trust. [Plan, § 10.3.4; Sorte Aff. ¶ 36].

New Street will issue warrants (New Street Warrants) to holders of Allowed Equity Interests in DBL Group Classes 7 and 9. New Street Warrants, in the aggregate, will represent the right to acquire from New Street, upon exercise, shares of New Street common stock representing up to approximately 12% of the shares of common stock on that date (on a fully diluted basis assuming exercise of all New Street Warrants), as provided in the New Street Warrant Agreement and the Plan. [Plan, § 10.3.5; Sorte Aff. ¶ 47].

Due to their failure to accept the Plan, holders of Allowed Equity Interests in DBL Group Class 8 will not receive New Street Warrants. DBL Group Class 8 consists of: (a) Equity Interests arising from the Series E Preferred Stock, Class 1 issued by DBL Group, all outstanding shares of which were held on the Petition Date by LBA, which Series E Preferred Stock, under its certificate of designation, has rights and attributes that are unique to such Series E Preferred Stock, but there is no understanding that such Stock was entitled to any priority or preference in reorganization over the Common Stock of DBL Group; (b) Equity Interests arising from Class C Stock Series 1 and Series 2 issued by DBL Group, all the outstanding shares of which were held on the Petition Date by LBA, which series, under their respective certificates of designation, have rights and attributes that are unique to such Series C1 and C2 Stock, but there is no understanding that such Stock was entitled to any priority or preference in reorganization; and, (c) related Claims arising from the purchase or issuance of all such shares under the related Exchange Agreement between LBA and DBL Group, dated November 27, 1989. At the time LBA acquired the Series C1 and C2 Stock, LBA and DBL Group waived the applicability of Article V of DBL Group's Charter to all of these Equity Interests. [Sorte Aff. ¶¶ 49–51].

All shares of DBL Group Common Stock and Class B Common Stock are classified together in DBL Group Class 9 and have nearly identical attributes. [*Id.* at ¶ 52].

DBL Group Class 9 may receive New Street Warrants even if Class 8 Failed to accept the Plan, which it did.[4] [Plan, § 6.11].

Any New Street Warrants allocated under the Plan to any Drexel Defendant that has been identified by the Pool Administrators as a person then subject to, or thereafter likely to be subjected to, litigation commenced by the Pool Administrators will be issued by New Street in the name of such person and delivered to the New Street Warrants Escrow Agent to be held in escrow under the terms of the New Street Warrants Escrow Agreement, the escrow agents of which are the Trustees. [Plan, §§ 6.10, 6.11 and 6.12; Sorte Aff. ¶ 57].

The initial senior officers of New Street will be John F. Sorte, President and Chief Executive Officer; Dennis M. Galgano, Mary Lou Malanoski, and Douglas T. McClure, Jr., Managing Directors; Carla Volpe Porter, Secretary and General Counsel; and Jeffrey Lomasky as Chief Financial and Operations Officer. [Sorte Aff. ¶ 58].

Initial terms of employment of the above-identified New Street management have been set by employment contracts approved by us dated April 25, 1991, May 9, 1991, and July 7, 1991. [Docket Nos. 2278, 2307, and 2563]. The contracts are assumable by New Street and will govern unless other agreements are reached between New Street and the officers. [*Id.* at ¶ 61].

Subject to the review and approval of the District Court or this Court, the Plan Proponents other than the Debtors have nominated Griffin B. Bell, Linda W. Hart, George Jost Hauptfuhrer, Jr., Paul H. Hunn, Gregg A. Jarrell, Ralph S. Saul, and Robert F. Shapiro, to serve as the initial directors of New Street for a one-year term (New Street Board), with Robert F. Shapiro serving as the Chairman of the New Street Board. [*Id.* at ¶ 62].

---

**4.** *See, In re Drexel Burnham Lambert Group, Inc., et al.,* 138 B.R. 714, "Memorandum of Decision on § 1129(b) Objections to Plan Confirmation," Slip Op. dated March 4, 1992 (Conrad, J.).

Each of the New Street directors (other than the Chairman) will receive a fixed annual fee of $20,000. In addition, each director will receive a fee of $2,000 per meeting attended (including meetings of any committees of the Board of Directors). The Chairman of the New Street Board will receive a starting annual base salary of $300,000 for a commitment to a more active role in the day-to-day operations of New Street. The amount may be reduced in subsequent years to reflect reductions in the time and attention that must be dedicated according to the nature of the services expected of the Chairman. [*Id.* at ¶¶ 67, 68]. Compensation of all directors will be subject to review and approval of the U.S. Bankruptcy Court or the U.S. District Court. [*Id.* at ¶ 69].

As long as the Trust holds a majority of the stock of New Street, the Trust, acting through the Trustees, will elect all members of the New Street Board, each of whom can be removed by the Trust at any time with or without cause. [Plan, § 10.-3.1; Sorte Aff. ¶ 65].

### C.

*DPI, DPI–A Corp., and DPI–B Corp.*

The Drexel Partnership Interests are general or limited partnership interests in approximately 37 partnerships that hold securities issued by former clients of Drexel in various transactions (principally high-yield bonds or equity securities of highly leveraged companies), which interests will be transferred to DPI under the Plan. [Sorte Aff. ¶ 75].

Under the Plan, the Drexel Partnership Interests are transferred to DPI, which is a Delaware limited partnership that will hold, manage, defend, sell, dispose of, and liquidate the Drexel Partnership Interests in an expeditious but orderly manner. [Plan, § 10.2.3; Sorte Aff. ¶ 74].

Two classes of limited partnership interests in DPI will be authorized and issued under the Plan, designated "A" (DPI–A's) and "B" (DPI–B's), with the DPI–B's being classified as "B–1's" and "B–2's".

(a) DPI–A's will be issued under the Plan to the Fixed Creditors (other than holders of Enforceable Claims in DBL Group Class 6A) and the Fixed Escrows either directly or indirectly through DPI–A Corp.; and

(b) 3,200 DPI–Bs will be issued under the Plan to the Securities Litigation Settlement Funds for the account of Securities Litigation Claimants either directly or indirectly through DPI–B Corp. [Plan, § 10.2.4; Sorte Aff. ¶¶ 82–84].

DPI will be owned directly, or indirectly through DPI–A Corp. and/or DPI–B Corp., by the Fixed Creditors (other than Creditors holding Enforceable Claims in DBL Class 6A) and the Securities Litigation Settlement Funds, respectively. [*See* Plan, §§ 10.2.4, 10.2.5, 10.2.6].

DPI–A Corp. and DPI–B Corp. will each be a newly-formed, special purpose corporation, the only assets of which will be limited partnership interests in DPI and the equity of DPI G.P. Corp., and the charters of which will prohibit non-voting equity. [Sorte Aff. ¶¶ 21, 85]. The sole director of DPI–A Corp. is to be selected by the Committees prior to Consummation. The three directors of DPI–B Corp. are to be selected by certain of the Securities Litigation Claimants Representatives. All directors will serve as the officers of such corporations and will be subject to annual elections by the vote of the stockholders of the corporations. [Plan, Ex. H; Sorte Aff. ¶ 89]. Initially, the compensation of the directors will be established under an agreement between the Trust and DPI–A Corp. or the Trust and DPI–B Corp., as the case may be, and, thereafter, under the majority vote of the stockholders of DPI–A Corp. or DPI–B Corp., as the case may be.

The general partner of DPI will be DPI G.P. Corp., which is a Delaware corporation, the sole director of which will be Mr. Richard J. Wright, formerly the Chief Financial Officer of Drexel, assisted by Tom DeFranchese, an officer of Drexel responsible, among other things, for monitoring and preparing reports regarding the Drexel Partnership Interests. DPI G.P. Corp. is to be owned by DPI–A Corp. and DPI–B Corp. for the benefit of the limited partners of DPI. The successors to Mr. Wright will

be selected by a vote of the limited partners of DPI through the stock of DPI–A Corp. and DPI–B Corp. Initially, the compensation payable to Mr. Wright will be set forth in a contract subject to our approval. Thereafter, such contract may be amended only with the approval of this Court and, through the stock vote of DPI–A Corp. and DPI–B Corp., the limited partner. [Sorte Aff. ¶¶ 76–80].

DPI will issue the DPI Note to the Trust. The DPI Note will be in an amount equal to 90% of the book value of the Drexel Partnership Interests and will be secured by all the assets of DPI. [*Id.* at ¶ 81].

### D.

### *The Pooled Contingent Assets*

Under the Claims Agreement and the Plan, the Debtors have agreed to "pool" certain causes of action which they have against certain persons with those of the Pooling Securities Litigation Claimants against such persons. This pooling enhances the value of the Debtors' Contributed Contingent Assets through coordinated prosecution of these claims by the Pool Administrators for the benefit of the Creditors.

The FDIC, RTC, and Milberg Weiss will act as the Pool Administrators and will have responsibility for directing the litigation and settlement of the various claims that comprise the Pooled Contingent Assets (PCA) pooled by the Debtors and the Pooling Securities Litigation Claimants. [Plan, § 10.6; Claims Agreement, Art. III].

Proceeds resulting from these pooled claims are to be distributed among the Trust (up to a maximum of $400 million in net proceeds) and the Pooling Securities Litigation Claimants as provided in the Plan. [*Id.*]

### E.

### *The Securities Litigation Settlement Funds*

Securities Litigation Settlement Fund A will be established for the Securities Litigation Claimants who are pooling their causes of action with the Debtors, and Securities Litigation Settlement Fund B will be established for the Securities Litigation Claim-

ants who are not pooling their causes of action with the Debtors. [Plan, § 10.5].

Distributions to these funds of cash, a portion of the net proceeds of the PCA and Plan Securities, as provided in the Plan, will be in full satisfaction and discharge of the liabilities of Drexel in respect of the Securities Litigation Claims. [Claims Agreement, § 2.7(c)].

Securities Litigation Settlement Fund A will receive:

(a) all CBI–B1's, CBI–B2's and CBI–B3's, together with any CBI–B Cash Distributions thereon;

(b) the DPI–B1's issued for the account of the FDIC and RTC and the DPI–B1's and DPI–B2's (or DPI–B Corp. Interests if so elected under § 10.2.4.b of the Plan) issued for the account of the Other Pooling Securities Litigation Claimants, together with any distributions thereon;

(c) 86% of Net PCA Proceeds as provided in § 3.4 of the Claims Agreement; and,

(d) distributions from the Drexel Civil Disgorgement Fund to which the Pooling Securities Litigation Claimants are entitled as Subclass A. [Plan, § 10.5.3].

Securities Litigation Settlement Fund B will hold:

(a) all CBI–B4's, together with any distributions thereon;

(b) DPI–B Corp. Interests representing DPI–B1's issued for the account of the Other Securities Litigation Claimants, together with any distributions thereon;

(c) any PCA Recoveries that may be due to the Other Securities Litigation Claimants from the Pool Administrators under § 2.14 of the Claims Agreement;

(d) the $15 million provided for in § 2.6 of the Claims Agreement; and,

(e) distributions from the Drexel Civil Disgorgement Fund to which the Other Securities Litigation Claims are entitled as Subclass B. [Plan, § 10.5.4]

### V.

### Plan Modification

On March 5, 1992, the Plan Proponents filed a modification to the Plan that effects

certain technical amendments and resolves certain objections to confirmation (Plan Modification). [Affidavit of Richard J. Wright dated March 4, 1992, ¶¶ 2–5]. In accordance with § 13.2 of the Plan, the modification was agreed to in writing by all the Plan Proponents. [*Id.*] The Plan Modification is not material.

The Plan Modification adjusts the Plan, but does not affect the classification of claims, the treatment of Allowed or Enforceable Claims, the settlements set forth in the Plan, the Plan Securities or the Plan Entities, except for certain modifications to the Disputed Priority Claims Reserve, the Milken Escrow, and the allocation of the equity of the DPI G.P. among the holders of direct or indirect interests in DPI. [*Id.*] All references herein to the Plan shall be deemed to refer to the Plan as modified by the Plan Modification.

## VI.

### Distributions

### A.

#### *Projected Recoveries under the Plan*

Projected Distributions under the Plan, set forth in the Financial Appendix to the Plan, show a present value recovery on Allowed Claims ranging from 54.8% for general Unsecured Claims against DBL Group to 75.0% for general Unsecured Claims against DBL Inc. (Projected Distributions). Although the projections are uncertain, and are based upon numerous assumptions, the Projected Distributions set forth in the Financial Appendix are reasonable. [Financial Appendix, § II.B.].

The Projected Distributions assume that Disputed Claims at Consummation will be in the $5.5 billion range, and will ultimately be allowed in the $415 million range. [Financial Appendix, at 5 n. 6]. This factor is a key determinant in calculating the Required Reserve Value, and thus in determining the level of cash that is available for distribution on Consummation. Given the progress to date on objections to claims, the objections currently pending,

and the current status of the Claims Docket, there is a substantial likelihood that the aggregate amount of Disputed Claims on Consummation will be far less than $5.5 billion.

### B.

#### *Distribution Mechanisms under the Plan*

#### 1.

#### Trust Distributions

On Consummation, Cash will be distributed to pay the Drexel Civil Disgorgement Fund, Administrative Claims, Priority Claims and Secured Claims that are Allowed Claims, Convenience Claims, and payments due on Tax Claims and Retiree Benefits Claims. Cash will be reserved in the Allowed Administrative/Tax Claims Reserve and the Disputed Priority Claims Reserve for such Administrative, Priority, and Secured Claims that are Disputed Claims or are not yet due and payable, as provided in the Plan and in a Stipulation between the Debtors and the Director of IRS. [Plan, § 10.1.7].

After providing for the above payments and reserves, the Trust, subject to the requirements of the Disputed Unsecured Claims Reserve, will make distributions of remaining Cash, known as Available Net Cash, as follows:

(a) Until cumulative Trust Cash Distributions and DPI Cash Distributions (including the DPI Tax Gross Up) have aggregated $1.30 billion, 85% of such distributions will be made to CBI–A's and, if then entitled, to CBI–C's. The remaining 15% of such distributions will be made to CBI–B's.

(b) Thereafter, until cumulative Trust Cash Distributions and DPI Cash Distributions (including the DPI Tax Gross Up) have aggregated $2.0 billion, 60% of such distributions will be made to CBI–A's and, if then entitled, to CBI–C's. The remaining 40% of such distributions will be made on account of CBI–B's.

(c) Cash Distributions and DPI Cash Distributions (including the DPI Tax Gross Up) in excess of $2.0 billion, further Trust Cash Distributions will be made

50% to CBI–A's and, if then entitled, CBI–C's, and 50% to CBI–B's.

[Plan, § 10.1.7; Sorte Aff. 131–34].

Available Net Cash distributed by the Trustees shall be deemed to consist, first, of Cash and Cash equivalents received from the Debtors on the Consummation Date, and, second, from the income on, and disposition of, securities and other assets of the Trust received from Drexel (and any investment income thereon), in the order in which such amounts are received.

In addition, the Trust will make certain special distributions:

(a) An additional distribution to Securities Litigation Claimants on their CBI–B's will be made, to the extent that Disputed Claims are disallowed in a specified amount. [Plan, § 10.1.7.g].

(b) After meeting certain reserve requirements, Net PCA Proceeds paid by the Pool Administrators to the Trust will be distributed to Plan Securities issued to the Fixed Creditors. [Plan, § 10.1.11].

## 2.

### DPI Distributions

The Plan requires DPI to apply the proceeds of the Drexel Partnership Interests to fund its own costs and various tax obligations, and, thereafter, to pay the DPI Note. Such DPI proceeds will flow through the Trust as Trust distributions. [Plan, § 10.2.5].

After all such payments are made, one percent of the remaining DPI proceeds will be distributed by DPI to DPI G.P., and 99% will be distributed by DPI as DPI Available Net Cash in accordance with the following formula:

(a) Until the sum of cumulative Trust Cash Distributions and DPI Cash Distributions (including the DPI Tax Gross Up) equals $1.30 billion, 85% to DPI–A's, and 15% to DPI–B's.

(b) Thereafter, until the sum of cumulative Trust Cash Distributions and DPI Cash Distributions (including the DPI Tax Gross Up) equals $2.0 billion, 60% to DPI–A's, and 40% to DPI–B's.

(c) Thereafter, 50% to DPI–A's and 50% to DPI–B's.

[Plan, § 10.2.5; Sorte Aff. ¶ 136–38].

## 3.

Distributions for Allowed Administrative/Tax Claims and Disputed Claims and Contested Claims that become Allowed Claims and Enforceable Claims

The Trust will make distributions from the Allowed Administrative/Tax Claims Reserve in payment of Allowed Administrative Claims and Tax Claims that are due and payable. [Plan, § 10.1.7].

The Trust will make a distribution of Cash from the Disputed Priority Claims Reserve to:

(a) any Priority Claim that has been allowed; and,

(b) any Secured Claim that has been allowed in an amount equal to the allowed amount of such Secured Claim, plus any interest actually earned in the Disputed Priority Claims Reserve from the Consummation Date on the Cash held for the allowed amount of such Secured Claim.

If the only reason a Disputed Secured Claim is a Disputed Claim is because of disagreement over whether the Disputed Secured Claim is secured or unsecured, then distributions will be made from the Disputed Priority Claims Reserve as if the holder of the Disputed Secured Claim held an Allowed Unsecured Claim and received the Plan Securities issuable on account of such Claim and Cash distributions payable on such Securities. [Plan, §§ 10.1.6 and 13.11].

Any holder of a Disputed Claim that becomes an Allowed Unsecured Claim, or a Contested Claim that becomes an Enforceable Claim after the Consummation Date, will receive from the Disputed Unsecured Claims Escrow or the Milken Escrow, as the case may be, the CBI–A's, CBI–C1's and DPI–A Corp. Interests (or DPI–A's to the extent such holder elects) to which such holder is entitled under the Plan. Such creditors will also receive "Catch Up Payments" in an amount equal to the aggregate distributions that would have been made to the date of allowance of such

Claim had such securities been issued for such Allowed Unsecured Claim or Enforceable Claim on the Consummation Date. [Plan, § 10.1.8; Sorte Aff. ¶ 139].

The Plan Entities must comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities (Withholding Requirements), and all distributions will be subject to such withholding and reporting requirements. The Trust will withhold from distributions to each holder of an Allowed Claim or Enforceable Claim representing compensation that is subject to Withholding Requirements. [Plan, § 13.14; Sorte Aff. ¶¶ 128–30].

### 4.

### Reserves

The Trust is required to maintain four reserves: (1) the Administrative/Tax Claims Reserve; (2) the Disputed Priority Claims Reserve; (3) the Disputed Unsecured Claims Reserve; and, (4) the Trust PCA Recovery Reserve. Reserves (3) and (4) are established to provide for the Claims of Fixed Creditors. [Sorte Aff. ¶¶ 107–27].

The Trust must fund the Administrative/Tax Claims Reserve, the Disputed Priority Claims Reserve, and the Disputed Unsecured Claims Reserve with Core Trust Assets. These Reserves must be funded before the Trust makes a Cash Distribution on Plan Securities. [*Id.*]

Prior to any Cash Distribution Date, the Trustee must value the Core Trust Assets. In calculating the necessary levels of Reserves, the Trustee may not use more than 80% of the value of New Street Stock and 90% of the value of the other Core Trust Assets (Adjusted Core Trust Values). The Trustee must:

(a) Provide for the Allowed Administrative/Tax Claims Reserve by holding a reserve of liquid assets for six months' Administrative Claims and Tax Claims, and of other assets as necessary for future installments of Tax Claims [Sorte Aff. ¶ 108];

(b) Hold and fund the Disputed Priority Claims Reserve, using (1) Adjusted Core Trust Values, to cover the claimed

amount of Disputed Administrative, Priority and Tax Claims, or such amount for a Disputed Claim as we determine as an estimate for reserve purposes; and, (2) Cash to cover Secured Claims that are disputed [*Id.* at ¶ 109];

(c) Retain Adjusted Core Trust Values in an amount equal to the amount that would be necessary to distribute upon such Disputed Unsecured Claims the same percentage recovery as received by Allowed Unsecured Claims in the appropriate Class, assuming that such Disputed Unsecured Claims had been allowed in their filed amount or such other amount as we determine as an estimate for reserve purposes. [*Id.* at ¶¶ 110–115].

[Plan, § 10.6].

The Trust PCA Recovery Reserve is also available to fund distributions to Disputed Unsecured Claims that become Allowed Claims. Cash distributed from the Trust PCA Reserve is solely for the benefit of Fixed Creditors. [Plan, § 10.1.11; Sorte Aff. ¶¶ 125–27]. The Trust is also required to administer the Fixed Creditor Escrows. [Sorte Aff. ¶ 107–24].

### 5.

### Escrows

The DBL Inc. Escrow holds 150,000 CBI–A's, DPI–A Corp. Interests equivalent to 150,000 DPI–A's, and 76,500 CBI–C2's, plus distributions and all investment earnings thereon, for the benefit of Allowed Claims in DBL Inc. Classes 4 and 6. [*Id.* at ¶¶ 116–18].

The DBL Inc. Escrow shall maintain the DBL Inc. Escrow Required Reserve for the account of Disputed Claims in DBL Inc. Classes 4 and 6.

Both the Milken Escrow and the ERISA Escrow are linked to the Employee ERISA/Compensation Claims Settlement and DBL Group Classes 6A, 6B and 6C. [*Id.* at 119–22].

(a) The ERISA Escrow will hold a maximum of 20% of the Plan Securities (and distributions thereon) otherwise distributable to DBL Classes 6A, 6B and 6C

pending expungement of ERISA Related Claims Over [*Id.* at ¶ 124]; and,

(b) The Milken Escrow is established to ensure parity of distributions between Claims in DBL Group Classes 6A and 6B. [*Id.* at ¶¶ 121–22].

## VII.

### Substantive Consolidation

The Plan depends upon substantively consolidating the assets and liabilities of DBL Group and the DBL Group Consolidating Subsidiaries, and substantively consolidating the assets and liabilities of DBL Inc. and the DBL Inc. Consolidating Subsidiaries. [Plan, Art. II].

Historically, Drexel operated as a single enterprise, for the benefit of the entire Drexel Burnham Lambert firm. The firm was owned by its employees. Drexel was managed with an eye to profit maximization for the entire enterprise rather than its various subsidiary components. [Wright Aff. ¶ 4].

The Drexel companies were organized into three basic categories: (1) operating companies that engaged in its various broker-dealer and customer businesses; (2) investment companies that were organized to hold investments and ventures; and, (3) special purpose finance companies that were established to raise capital for one or more of the operating companies. Among the Debtors:

(a) DBL Inc., DBL GSI, DBL Commercial Paper, DBL Products and DBL Trading were Drexel operating companies (the Drexel Operating Companies); and,

(b) BRR, Deauville, Double Oil & Gas, DBL C.P., DBL Investors, DBL MBI, DBL Capital Group and Holdings were Drexel investment companies (the Drexel Investment Companies).

The Debtors had interlocking directors. One or more of Fred H. Joseph, Richard J. Wright, and Joseph Vitanza served as directors and, in most instances, officers of each of the Debtors. [*Id.* at ¶¶ 25, 26].

Except for DBL Trading, all of Drexel was headquartered and controlled from its New York City offices on 55 and 60 Broad Street, and the annexed space at 2 Broadway. All the space was leased in the name of DBL Group and paid for by DBL Inc. Through various intercompany accounts, rent was charged back to DBL Group and reallocated to the various Debtors. [*Id.* at ¶ 23].

All support functions, including finance, legal, administrative, operations clearing systems, communications, mailroom, internal audit, and, external audit were provided by DBL Inc. Throughout Drexel, most employees received checks and W–2 statements from DBL Inc., although their salary expense, once charged to DBL Group, was then expensed by DBL Group to the various Drexel components. Rent, equipment leases, and similar operating expenses were treated in a similar manner, colloquially known as the "Group Loop." These expenses became part of an intricate network of intercompany accounts. [*Id.* at ¶¶ 24, 28]. There were intercompany equity accounts, tax accounts, operating accounts, and, in some instances, loan balances (on both subordinated and senior bases). Some of the account balances represented years of transactions.

With respect to the Drexel Operating Companies, other than DBL Inc., it was customary for their customers, creditors, and counterparties to seek guarantees of DBL Group. [*Id.* at ¶ 20].

Except for DBL Products and DBL Commercial Paper, each of the Drexel Operating Companies was subject to extensive regulation, directly and indirectly, by the Securities and Exchange Commission, the Comptroller of the Currency, the Federal Reserve Bank System, the Commodities and Future Trading Commission, the New York Stock Exchange, the Chicago Board of Trade, the National Association of Securities Dealers, as well as most states in which a Drexel Operating Company did business.

Although these reporting requirements, among other things, caused Drexel to segregate and identify on its books, the assets and liabilities of DBL Inc., DBL GSI, and DBL Trading, it also caused an asset transfer and investment holding structure that

was designed and motivated, in large part, to hold certain illiquid assets and investment transactions in DBL Group or the Drexel Investment Companies outside the regulatory environment governing the Drexel Operating Companies. [*Id.* at ¶ 12].

In Drexel, the enterprise and the preeminence of the firm, as a whole, was dominant. For example, after the Consent Decree, Drexel embarked upon a course of action which essentially "lent" the assets of DBL Group to support the underwriting and other operations of the Drexel Operating Companies, particularly DBL Inc. These support activities included: using DBL Group to "bridge" and finance (on a subordinated or equity basis) various major acquisitions involving DBL Inc., such as West Point Pepperell and J.P. Stevens; using DBL Group to absorb unsold securities from various highly leveraged transactions underwritten or placed by DBL Inc.; and using DBL Group to support the ever-increasing Drexel litigation reserves.

With the benefit of hindsight, DBL Group suffered tremendous losses on these support activities, became increasingly illiquid and, even after draining substantial liquidity from the Drexel Operating Companies and the Drexel Investment Companies, DBL Group lost access to the commercial paper market, was unable to meet its obligations, and commenced these Chapter 11 cases.

From time to time, Drexel made various investments, such as small real estate venture investments, various merchant banking (*i.e.*, illiquid, long term equity) investments, investments in smaller partnerships seeking acquisition ventures, oil and gas investments, the Drexel Partnership Interests, leverage lease investments, and other joint venture investments. These investments were held in one or more of the Drexel Investment Companies. [*Id.* at ¶ 10].

To the extent these investments consist of securities of large well known issuers, these investments usually originated from transactions undertaken and frequently underwritten by DBL Inc. In particular, the securities that are scheduled as being owned by MBI and the Drexel Partnership Interests that were owned by Investors were issued and/or acquired in connection with an acquisition or other financing involving DBL Inc., and in the later years, the bridge financing of DBL Group. [*Id.* at ¶¶ 11, 12].

In many instances, these investment securities were moved from DBL Inc., directly or indirectly, to DBL Group or one of the Drexel Investment Companies to permit Drexel to hold the illiquid, high risk, long term equity type investments separate from the customer-oriented Drexel Operating Companies. Frequently, only beneficial ownership of these securities was transferred. Either DBL Inc. or DBL Group remained the registered owner of the security in the issuer's books and records. Issuers were not aware of the transfer to a different Drexel entity. [*Id.* at ¶¶ 11, 12, 14]. These asset movements were recorded as part of the intercompany accounts. The remaining investments were mostly ventures requiring an initial and frequently subsequent cash investments. [*Id.* at ¶¶ 13, 15].

In some of these ventures, the investment was premised upon a contract or other arrangement with DBL Group. In turn, DBL Group assigned the investment and related obligations for additional equity investments to one of the Drexel Investment Companies, such as the investment in Oxnard Town Center and its relation to DBL Investors, or housing investments owned by CP. DBL Group was not released of its obligations by the assignment of the investment to a Drexel Investment Company. Frequently, such co-investors were unaware of the existence or involvement of any Debtor other than DBL Group. [DBL Group Docket Nos. 316, 1109, 1851, 2357 and 3362, respectively].

None of the Drexel Investment Companies sustained any business operations and hence, did not maintain cash balances. When any Drexel Investment Company required cash, for instance, to exercise an expiring warrant, or meet an additional equity subscription liability, DBL Group funded the cash requirements through moving

cash from DBL Inc. through DBL Group to the Drexel Investment Company, as needed. Alternatively, because DBL Inc. or DBL Group was the registered owner of the warrant or other security, the security would be returned by the Drexel Investment Company to DBL Group or DBL Inc., as the case may be, to exercise or participate in a registered equity offering. [DBL Group Docket Nos. 436 and 437, respectively]. The transfers were recorded as part of the intercompany accounts. [Wright Aff. ¶¶ 4, 28].

Similarly, when a Drexel Investment Company realized cash, the cash was usually moved to DBL Group to support its obligations. The movement was recorded as part of the intercompany accounts. [Id. at ¶ 4].

The obligations under certain compensation plans for employees of DBL Inc. were measured by the performance of securities held by the Drexel Investment Companies and frequently registered in the name of DBL Inc. Those obligations appear on the books of the Drexel Investment Company holding the relevant security. Historically, an obligation under these compensation plans matured and was payable only when the security realized a net cash profit. Usually, by that time, the security and/or cash had been returned to DBL Inc., together with the corresponding liability under the compensation plans. [Id. at ¶ 14].

The Drexel Investment Companies had no independent Creditors, except for the temporary appearance of the net profit sharing obligations in the DBL Inc. compensation plans. The Drexel Investment Companies either met their investment calls or forfeited the investment. The credit and strength of DBL Group, by virtue of its origination of the contract or its guaranty were involved, in almost every instance required additional equity infusions. [Id. at ¶ 15].

None of the Drexel Investment Companies had its own employees.

The Drexel Operating Companies were DBL Inc., DBL Trading, DBL GSI, DBL Products and DBL Commercial Paper. DBL Inc. was a full service broker-dealer and investment bank. DBL Trading was involved in commodity transactions for precious metals, oil and foreign exchange. DBL Products was engaged in the interest rate swap business. DBL Commercial Paper was involved, using DBL Inc. as a clearing broker, as a dealer of commercial paper, including the commercial paper issued by DBL Group and the large customers of DBL Inc. Each of the Drexel Operating Companies had customers, creditors and/or counterparties. [Id. at ¶¶ 38–45].

The regulatory network governing the Drexel Operating Companies required, among other things, that a Drexel Operating Company meet certain financial criteria, based upon calculations and reports required by and submitted to the regulators. Certain of such criteria, such as the "Net Capital" rules applied to DBL Inc., were closely monitored by Drexel and the regulators, requiring monthly, quarterly and annual reports of assets and liabilities, in the format, and with the risk and other adjustments to assets and liabilities, that are specified by the regulators. These reports were available to the New York Stock Exchange, other securities associations and the public, including Customers. Under these regulations, certain assets (typically including illiquid, long-term, non-investment grade equities) were given little or greatly discounted values, despite a legitimate higher valuation for other financial reporting purposes. [Id. at ¶ 3].

Prior to the commencement of its Chapter 11 Cases, DBL Group transferred substantial sums of cash to itself from each of the Drexel Operating Companies (other than DBL Commercial Paper). Still, DBL Group could not meet its obligations and sought relief under Chapter 11.

With the commencement of the Chapter 11 Case of DBL Group, the Drexel Operating Companies began to unwind their businesses and settle their customer and counterparty transactions. During this settlement and unwind, each of the Drexel Operating Companies satisfied their customers and counterparties. DBL GSI and DBL Products (collectively with, DBL Commercial Paper, the "Unwound Drexel Operat-

ing Companies") were also able to satisfy their independent Creditors. DBL Commercial Paper satisfied virtually all but its contingent Creditors which, in virtually all instances, also looked to DBL Group. Only DBL Trading and DBL Inc. had a substantial amount of identifiable, independent Creditors and assets. In the case of DBL Trading, remaining assets consisted primarily of intercompany accounts with DBL Group. [*Id.* at ¶ 8].

Consolidating the assets and liabilities of the Drexel Investment Companies and the Unwound Drexel Operating Companies accords with the reality of Drexel's operation, the public perception of Drexel and the available financial information about Drexel. Confirmation of the Plan is dependent upon the substantive consolidation of DBL Group, the Drexel Investment Companies and the Unwound Drexel Operating Companies.

There was no reliance on the credit of any of the Drexel Investment Companies, DBL Products, DBL Capital, or DBL Commercial Paper independent of DBL Group, and there are no independent Creditors of DBL GSI. [*Id.* at ¶¶ 17, 19, 22]. The affairs and investment activities of each Drexel Investment Company were inextricably intertwined with and dependent upon, the business and operations of DBL Group, as reflected in a complex, multitiered network of intercompany accounts. [*Id.* at ¶¶ 4, 15, 22].

There is no prejudice arising from the substantive consolidation of DBL Group with the Drexel Investment Companies and the Unwound Drexel Operating Companies. [*Id.* at ¶¶ 6, 8].

DBL Asia, DBL Caribe, and DBL International were all established as parts of DBL Inc. to meet foreign and domestic regulatory requirements, so that the operations of DBL Inc. could be extended to Japan, the Caribbean and the United Kingdom. DBL Asia has some local creditors in Japan. The Japanese authorities have sequestered sufficient cash assets of DBL Asia which are located in Japan to satisfy such local creditors. Hence, only the net assets will be returned to be dealt with in these Chapter 11 cases.

Neither DBL Caribe nor DBL International has any independent creditors. Neither DBL Caribe nor DBL International has any employees of its own. Neither DBL Caribe nor DBL International published unconsolidated financial statements. No creditor, customer or counterparty ever looked to the independent credit of DBL Caribe or DBL International. DBL Caribe and DBL International did not advertise in their own names and did not hold themselves out to the public as independent entities. [*Id.* at ¶ 16].

Consolidating the assets and liabilities of DBL Asia, DBL Caribe and DBL International accords with the reality of Drexel's operation, the public perception of DBL Inc., and the available financial information. [*Id.* at ¶¶ 42–45].

Confirmation of the Plan is dependent upon the substantive consolidation of DBL Inc. with DBL Asia, DBL Caribe and DBL International. Except for DBL Asia's local creditors, which are already provided for under local law, there was no reliance upon the credit of DBL Asia, DBL International or DBL Caribe independent from DBL Inc. and there are no independent creditors of DBL Asia, DBL Caribe and DBL International. [*Id.*]

The business and operations of DBL Asia, DBL Caribe and DBL International were inextricably intertwined with and dependent upon the business and operations of DBL Inc. [*Id.*]

Under the circumstances, there is no prejudice arising from the substantive consolidation of DBL Inc. with DBL Asia, DBL Caribe and DBL International. [*Id.*]

### VIII.

#### Settlements in the Plan

The Plan incorporates the terms of five settlements:

(1) the settlement of the Securities Litigation Claims as provided in the Claims Agreement;

(2) the Intercompany Settlement;

(3) the DBL Group Guaranty Holder Settlement;

(4) the Employee ERISA/Compensation Claims Settlement; and,

(5) the DBL Trading Pro Rata Payments Settlement [Sorte Aff. ¶ 144].

Each of the settlements is the result of extensive arm's length negotiations. [*Id.* at ¶ 145].

Absent the settlements, the complexity, cost and delay of litigation to address the issues resolved by each settlement would be enormous. [*Id.* at ¶ 146].

The Debtors and the other Plan Proponents, their respective counsel and financial advisors, have carefully evaluated all aspects of the settlements. [*Id.* at ¶ 147].

## A.

*Securities Litigation Claims Settlement*

The Plan implements and incorporates by reference the terms of the settlement contained in the Claims Agreement that was approved by the U.S. District Court and the U.S. Bankruptcy Court on August 9, 1991. *Securities and Exchange Commission v. Drexel Burnham Lambert Incorporated (In re Drexel Burnham Lambert Group, Inc.)*, 130 BR 910 (S.D.N.Y.1991). [*Id.* at ¶ 148; Gruenberger Aff. II ¶ 3].

The Claims Agreement provides for, among other things, the division of Drexel assets between Fixed Creditors and Securities Litigation Claimants, and the pooling and allocation of certain contingent assets to enhance mutual recovery. [Sorte Aff. ¶ 150; Gruenberger Aff. II ¶ 4]. The Claims Agreement includes:

(a) The class of Securities Litigation Claimants is unimpaired. [Claims Agreement Order 30–31].

(b) The class of Securities Litigation Claimants consists of two subclasses: Subclass A, the class of Pooling Securities Litigation Claimants, consisting of the FDIC/RTC and the Other Pooling Securities Litigation Claimants; and Subclass B, consisting of the Other Securities Litigation Claimants.

(c) Milberg Weiss has been appointed class counsel to the Other Pooling Securities Litigation Claimants in Subclass A. [Claims Agreement Order at 21].

(d) Lead liaison counsel in MDL 732 has been appointed class counsel to Subclass B, the Other Securities Litigation Claimants. [Claims Agreement Order at 21].

The Claims Agreement Order has not been overturned. The appeal of three objectants to entry of the Claims Agreement Order is *sub judice* before the United States Court of Appeals for the Second Circuit. All briefs on appeal have been filed and oral argument was heard on January 27, 1992. The objections to the Plan by these objectants were denied at the confirmation hearing. [See transcript of hearing].

The Claims Agreement identifies 850 Claims as Securities Litigation Claims. These Claims are comprised of over 100 pending litigations in 18 districts before 60 different Judges and assert, to the extent such claims are liquidated, over $20 billion in liability for damages, exclusive of duplicative and facially defective claims. [Gruenberger Aff. II, ¶¶ 7, 8 and Gruenberger testimony]. In many instances, the Claims are asserted jointly and severally against DBL Group and DBL Inc. and, at times, certain other Debtors. [*Id.* at ¶ 27].

In most cases, the Securities Litigation Claims involve or are part of actions asserted against parties other than Drexel, based upon activities involving or related to Drexel, its employees, or partners. [*Id.*] In many instances, such parties or codefendants have claims over, or claims for, contribution against Drexel, and codefendants have made Claims for indemnity against Drexel. Each Securities Litigation Claim is related to events occurring prior to the Petition Date, which may have occurred as long as ten years ago. [*Id.*]

The Claims Agreement settles the Securities Litigation Claims and requires the Securities Litigation Claimants to obtain a release of or otherwise indemnify Drexel against any Claims over against Drexel or Claims for contribution or indemnity against Drexel. [Claims Agreement, § 2.7].

## B.

### Intercompany Settlement

Under the Plan, intercompany Claims will be treated as though they are extinguished as among the Debtors. [Sorte Aff. ¶ 151]. The elimination of intercompany claims, in part, results from, and is consideration for, the differing allocations of distributions to the Creditor classes of the different Debtors. [*Id.* at ¶ 152]. The distribution scheme between such classes results from a complex compromise and settlement (the Intercompany Settlement) negotiated among the Debtors and the other Plan Proponents, in respect of myriad intercompany and other matters, particularly those regarding DBL Inc.'s relationships, as the Debtors' principal operating unit, with the other Debtors, Michael R. Milken, the Securities Litigation Claims, the Drexel Civil Disgorgement Fund, and the Claims for federal taxes. [*Id.* at ¶ 153].

The following facts and circumstances, in no order of relative importance, are among those matters giving rise to the disputes resolved by the Intercompany Settlement:

—Propriety of substantive consolidation, particularly as it related to regulated entities, and related adjustments of recoveries that take into account guarantees, joint and several liabilities, subordinated claims, and intercompany claims.

—Setoff of intercompany subordinated and non-subordinated claims against each other.

—Allocation of liabilities associated with the Securities Litigation Claims Settlement.

—Claims for contribution and/or indemnity against DBL Inc. by the other Debtors, based upon certain Securities Litigation Claims.

—Allocation of IRS Tax Claims.

—Allocation of the 1989 refund from the IRS.

—Disputed ownership of assets (based upon the claimed inadequacy of consideration for intercompany transfers and alleged misappropriation of corporate opportunities among Debtor and non-Debtor subsidiaries).

—Intercompany claims based upon tracing of funds that were transferred between and among the Debtors and non-Debtor subsidiaries.

—Reallocation of liabilities assumed by DBL Group to other Debtor and non-Debtor subsidiaries and tracing of funds related to such transactions.

—Preference claims based upon intercompany transfers.

—Allocation of the benefits and claims for recovery of preferences and fraudulent conveyances.

—Allocation of recoveries on claims against third parties for breach of fiduciary duty and theft of corporate opportunity.

—Allocation of recoveries on claims against third parties for breach of fiduciary duty and theft of corporate opportunity.

—Allocation of recoveries from insurance benefits.

—Allocation among the Debtors of administrative expense costs of the bankruptcy estates.

—Allocation among the Debtors of consequential damages and liability flowing from acts giving rise to the Consent Decree.

—Allocation of liability for indemnification claims arising from litigations against third parties by the Debtors and non-Debtors.

—Allocation of joint and several liability of DBL Inc. and DBL Group under the Consent Judgment.

[*Id.* at ¶ 154].

The Committees and the other Creditor constituencies elected and agreed to settle these differences, because of the significance of the intercompany claims issues, and the fact that the views on the resolution of these issues varied greatly. [*Id.* at ¶ 155].

The settlement is considered essential in the context of negotiations regarding the Plan so that the reorganization effort could continue. [*Id.* at ¶ 156].

The Debtors, together with their counsel, have evaluated numerous possible out-

comes if the above identified issues were tried to a conclusion. These analyses assumed that (a) the Tax Settlement and the Claims Agreement remain intact, and (b) these cases continued in chapter 11 while the intercompany issues were tried.

For analytical purposes, not all of the intercompany issues are susceptible to quantification. The Debtors' analysis focuses on nine factors readily susceptible to quantification. They are:

(1) liability for obligations previously paid or owed as a result of the Consent Decree, together with the costs associated with reaching a settlement with the Securities and Exchange Commission;

(2) liability for the obligations undertaken in the Claims Agreement;

(3) liability for the Tax Settlement;

(4) allocation of the 1989 federal tax refund;

(5) ownership of the majority of assets of the Drexel Investment Companies;

(6) allocation of recoveries of net proceeds from the Pooling Contingent Assets;

(7) enforcement of a DBL Group claim over against DBL Inc.;

(8) enforcement of a DBL Trading claim over against DBL Group; and,

(9) the relative priority of DBL Trading intercompany receivable from DBL Group (collectively, the "Primary Intercompany Issues"). [Wright Aff. ¶ 47].

Each of the Primary Intercompany Issues is a cornucopia of potential litigation by and among DBL Trading, DBL Inc., and DBL Group. The outcome of each of the Primary Intercompany Issues is uncertain. Overall, the probability of success on any one Primary Intercompany Issue is closely related to one or more other Primary Intercompany issues, having a different (i.e., greater or lesser) probability of success.

By varying the outcomes of the Primary Intercompany Issues, in a manner that Debtors' counsel believes is reasonable and has a sustainable probability of success, the Intercompany Settlement places all unsecured Creditor constituencies within a range that can be reasonably anticipated. [Id. at ¶¶ 46–55].

In the case of each of DBL Inc., DBL Group, and DBL Trading, there are scenarios within the anticipated range that leave their general unsecured Creditors with materially less than the Plan provides for such general unsecured Creditors, and, in certain instances, materially more than the Plan provides for such general unsecured Creditors. The most favorable scenarios for one of DBL Group, DBL Inc., or DBL Trading necessarily results in the least favorable hypothetical result for the remaining two Debtors. [Id.]

The resulting distribution scheme, as set forth in the Plan, represents the results of these settlement efforts. As the product of a negotiated compromise and settlement, the settlement of the intercompany claims issues is not derived from a precise mathematical formula arising from fixed and certain treatment of intercompany claims. Rather, the settlement, and the distribution allocations embodying the settlement, represent the product of the agreed resolution of a large number of uncertain issues in the context of a comprehensive settlement of issues regarding the treatment of all Claims against the Debtors. [Sorte Aff. ¶ 157].

## C.

### DBL Group Guaranty Holder Settlement

The DBL Group Guaranty Holder Settlement arose from the necessity of dealing with the myriad of considerations, which simultaneously necessitated the intercompany settlement. [Id. at ¶ 158].

The Committees and the Fixed Creditor constituencies elected to settle these differences, because of the significance of the guaranty Claims issues, and the fact that the views on the resolution of these issues varied greatly. [Id. at 159]. The settlement was considered essential in the context of negotiations regarding the Plan so that the reorganization effort could continue. [Id. at ¶ 160]. The settlement provides for treatment of certain guaranty claims against DBL Group, as specified in the

differing treatment received by DBL Group Classes 5A and 5B. [*Id.* at ¶ 161].

The resulting distribution scheme, as set forth in the Plan, represents the results of these settlement efforts. As the product of a negotiated compromise and settlement, the settlement of the related intercompany issues on the guarantees is not derived from a precise mathematical formula arising from fixed and certain treatment of intercompany claims. Rather, the settlement, and the distribution allocations embodying the settlement, represent the product of the agreed resolution of a large number of uncertain issues in the context of a comprehensive settlement of issues regarding the treatment of all Claims against the Debtors. [*Id.* at ¶ 162]. For instance, had substantive consolidation of all the Debtors into one entity been pursued to a successful conclusion, there would have been no enforceable guaranty claims. Under the DBL Group Guaranty Settlement, only a portion of the guaranty claims against DBL Group that are held by Creditors of DBL Inc. and DBL Trading are recognized.

### D.

### *Employee ERISA/Compensation Claims Settlement*

The Employee ERISA/Compensation Claims Settlement resolves all Claims exclusive of any Claims held by Drexel, whether direct or indirect, against DBL Inc., DBL Group or any other Debtor, or any of their officers, directors, employees, agents, or any custodian, trustee, or other fiduciary appointed or engaged under any agreement relating to a pension, deferred compensation, stock, stock option, convertible debentures, bonus or other incentive compensation, profit sharing or other employee benefit or compensation plan, program or arrangement sponsored, established, maintained or contributed to by DBL Inc., DBL Group or otherwise by Drexel including, but not limited to, any direct stock offering of stock of DBL Group for:

(a) breach of fiduciary duty or the aiding or abetting or inducement thereof under ERISA or other law in connection with the establishment, administration, implementation or investment or asset valuation of any express or implied employee benefit or compensation plan, program or arrangement;

(b) breach of contract;

(c) breach of any express or implied guarantee;

(d) fraud, negligence or misrepresentation;

(e) state law claims for unpaid wages;

(f) indemnification; or,

(g) any other claim, in each case relating in any manner to the issuance, sale, purchase or repurchase, or ownership of DBL Group capital stock, warrants, convertible debentures or stock options to DBL Employees under any such plan, program or arrangement whether or not subject to ERISA, including, but not limited to, any deferred compensation trust or any custodial agreement including any unpaid bonuses with respect to 1989 as to which employees were participants in the 1989 Deferred Compensation Plans, or to DBL Employees.

[Sorte Aff. ¶ 163]. The Employee ERISA/Compensation Claims Settlement releases the Debtors, their officers, directors, employees and agents, and any trustee, custodian, or other fiduciary with respect to any express or implied pension, deferred compensation, stock, stock option, convertible debentures, bonus or other incentive compensation, profit sharing, or other employee benefit or compensation plan, program or arrangement sponsored, established, maintained or contributed to by DBL Inc., DBL Group or otherwise by Drexel including, but not limited to, any direct offering of stock of DBL Group, from all liability arising from Employee ERISA/Compensation Claims, and enjoins the prosecution of all law suits by the holders of Employee ERISA/Compensation Claims relating to such Claims. [Plan, Exhibit A "Glossary," ¶ 167].

The Employee ERISA/Compensation Claims Settlement is divided into three parts: (1) the DBL Group Redemption/ERISA Claims Settlement covering

claims of DBL Group Class 6A members; (2) the DBL Group Subordinated Debt/ERISA Claims Settlement covering claims of DBL Group Class 6B members; and, (3) the DBL Group Shareholder ERISA/Compensation Claims Settlement covering claims of DBL Group Class 6C members. [*Id.*]

The Employee ERISA/Compensation Claims Settlement implements all three settlements, and provides that, for purposes of the settlement, the Claims in DBL Group Classes 6A, 6B and 6C are *pari passu* and equal rank against DBL Group, but are subordinated under § 510 to Allowed Claims in DBL Group Classes 1, 2, 3, 4, 5A and 5B. In addition, it provides that upon the release of the Debtors and those other Persons specified in the Employee ERISA/Compensation Claims Settlement by holders of Employee ERISA/Compensation Claims that are not otherwise in DBL Group Classes 6A, 6B and 6C, the Debtors release such holders from any and all claims or causes of action of the Debtors' estate based upon receipt of stock redemption payments or stock redemption notes. [*Id.*]

Among the issues compromised and settled by the Employee ERISA/Compensation Claims Settlement are:

(a) allegations that (1) Drexel's practice of offering restricted shares of DBL Group stock to several thousand current and former employees and its requirement and practice that such shares be repurchased upon retirement or other employment termination constituted a deferred compensation pension plan governed by ERISA, for which DBL Inc. was a fiduciary, (2) as such, DBL Inc. and DBL Group and certain individuals as Drexel's agents breached their fiduciary duty to the participants of all Drexel's stock-funded express or implied benefit plans and programs when they failed to disclose Michael Milken's civil and criminal securities law violations and the impact such violations would have on the Debtors' business and the value of the securities held or comprised by these benefit programs, (3) DBL Inc. breached employment contracts by the establish-

ment of the 1989 Deferred Compensation Plans, and (4) DBL Inc. and DBL Group would be liable under contracts, common law or under ERISA, to the fiduciaries of these benefit plans and programs and other potential third-party indemnities to the extent such Persons are found liable for the foregoing allegations;

(b) the extent to which the cash redemption claims of holders of DBL Group Class 6A are senior unsecured claims of DBL Group;

(c) the extent to which § 510(b) would require subordination of some or all of the Claims of members of DBL Group Classes 6A, 6B and 6C; and,

(d) whether the voluntary contractual subordination by certain DBL Inc. Creditors to any claims of DBL Inc. other than those that are the "subject of satisfactory subordination agreements" and the provisions of § 510(a) protect DBL Group Classes 6A, 6B and 6C claims from subordination under § 510(b).

[Disclosure Statement at 75–79].

Fair cause exists for litigation by the holders of Employee ERISA/Compensation Claims. The settlement avoids the need for lengthy and costly litigation, the outcome of which would be uncertain, by many parties, including DBL Group, DBL Inc., former officers and directors of both and others for Employee ERISA/Compensation Claims and for indemnification and contribution Claims. The Debtors, the Committees, the *Ad Hoc* Committee and their respective experienced bankruptcy counsel evaluated numerous possible outcomes if the foregoing issues would be tried. Each settling party recommends adoption of the Employee ERISA/Compensation Claims Settlement because the actual and potential claims raised by the members of DBL Group Classes 6A, 6B and 6C against the Debtors and parties with indemnification or contribution rights aggregate in excess of $750 million.

The Employee ERISA/Compensation Claims Settlement resolves Claims asserted both in current and threatened litigations pending against former employees of the

Debtors and the named fiduciaries of the Stock Bonus and Profit–Sharing Plans, and in hundreds of proofs of claims filed by former employee-shareholders and actual or potential indemnitees. [*Id.*]

The members of each of DBL Group Classes 6A, 6B and 6C receive benefits from the settlement. The members of DBL Group Class 6A receive the largest proportionate recovery on account of their Claims, while members of DBL Group Class 6B receive substantial benefit from the Debtors' waiver of claims on account of stock redemption payments. DBL Group Class 6C as a whole receives the largest number of Plan Securities. Holders of Employee ERISA/Compensation Claims who receive no Plan Securities nevertheless receive substantial benefit from the Debtors' waiver of claims because of the stock redemption payments.

The allocation of Plan Securities among the members of DBL Group Classes 6A, 6B and 6C results from a compromise and settlement negotiated at arm's length among the Committees, the *Ad Hoc* Committee of Subordinated Debt Holders of DBL Group, the Administrative Committee of the Stock Bonus and Profit–Sharing Plans, and the other Plan Proponents in respect of the varied and numerous ERISA and compensation Claims of the members of these classes. In part, it reflects the perceived value of the Debtors' releases from claims based upon stock redemption payments and/or redemption notes made or issued prior to the Petition Date.

The scope of the releases under this settlement are limited to issues raised by Employee ERISA/Compensation Claims, recoveries on account of that have been channeled to the Plan Securities allocated to the settlement. The injunction and releases provided for in the Employee ERISA/Compensation Claims Settlement are an integral and necessary part of that settlement, and are essential to its implementation. Further, the Employee ERISA/Compensation Claims Settlement, in its entirety, affects both the Intercompany Settlement and the Securities Litigation Claims Settlement and, thus, is a key part of the Plan and is necessary for the Plan to be confirmed.

Given the conflicting positions and interests, the risks that some Employee ERISA/Compensation Claims may be subject to one or more forms of subordination under § 510, and the value of stock redemption payments that are being released by the Debtors, (a) the aggregate amount of Plan Securities allocated to the Employee ERISA/Compensation Claims Settlement, (b) the specific allocation of Plan Securities to each of the DBL Group Shareholder ERISA/Compensation Claims Settlement, the DBL Group Subordinated Debt/ERISA Claims Settlement and the DBL Group Redemption/ERISA Claims Settlement, and (c) the formula used to allocate the applicable Plan Securities to the members of each such settlement class, each fall well within a range of reasonableness.

### E.

### *DBL Trading Pro Rata Settlement*

To avoid costly and lengthy litigation and to account for certain defenses of the Preference Defendants, the Plan provides for the settlement of potential preference claims with respect to partial, settlement payments made to creditors of DBL Trading between March 1, 1990 and May 9, 1990. These payments were to have been made pro rata to substantially all third-party Creditors of DBL Trading and amounted to approximately 14% of the outstanding obligations of DBL Trading to such parties.

In full settlement of the rights, if any, of the estate to recover such payments as preferential, the amount of CBI–A's distributed to such Creditors under the Plan will be based on their Allowed Claim less their ratable portion of 14% of the Allowed Claims of those third-party Creditors of DBL Trading who did not receive such preferential payments. This settlement will provide those Creditors with substantial benefits without having the estate bear the costs and risk of litigation and attendant delay.

## IX.

### Best Interests Test

In the Financial Appendix to the Disclosure Statement there are projections compiled by the Debtors indicating that under the Plan, the Impaired Creditors will receive Plan Securities and an initial cash distribution that are expected to yield a present value recovery of 75% in the case of DBL Inc. Class 4 Claims, 54.8% in the case of DBL Group Class 4 Claims, and 58.3% in the case of DBL Trading Class 3 Claims. [Financial Appendix at 8].

In viewing these Chapter 11 Cases as if they were cases under Chapter 7, there are significantly different considerations. First, there would be no Claims Agreement or settlement of the Securities Litigation Claims. Second, there would be no Intercompany Settlement. [Gruenberger Aff. ¶ 7–24].

Similarly, under Chapter 7, the Debtors would not have the benefits of the Pooling Securities Litigation Claimants Contributed Contingent Assets. In pursuing the Contributed Contingent Assets, the Debtors would compete with the Securities Litigation Claimants, likely suffering a significant diminution in value of the Debtors' Contributed Contingent Assets. [*Id.*]

In the Financial Appendix, there is an analysis of the Debtors' assets in liquidation that takes a conservative view of the likely deterioration in asset values of the Debtors in Chapter 7, and an analysis of the likely increase in operating costs in Chapter 7. [Financial Appendix at 28–30].

To take the absence of the Claims Agreement into account, the financial analysis of the Debtors' Plan, as set forth in the Financial Appendix, may be adjusted to eliminate the Claims Agreement by (a) returning to the Debtors' estates (1) the present value of the projected recoveries on account of the Plan Securities issued to or for the benefit of the Securities Litigation Claimants, and (2) the payment of the Drexel Civil Disgorgement Fund Obligation, and (b) removing from the anticipated assets, the present value of the projected Trust PCA Proceeds. [Gruenberger Aff. ¶¶ 7–24].

To take the absence of the Intercompany Settlement into account, the financial analysis of the Debtors' Plan as set forth in the Financial Appendix is adjusted to eliminate the Intercompany Settlement by (a) allocating the liability for the Tax Settlement equally between DBL Group and DBL Inc., (b) allocating a theoretical $500 million recovery on the Debtors' Contributed Contingent Assets equally between DBL Group and DBL Inc., and (c) determining the present value of the recovery on DBL Trading's assets, including the combined intercompany receivables of approximately $523,860,000 from DBL Group and DBL Inc. and cash at $232,980,000. [Wright Aff., Exhibit B].

The liquidation analysis in the Financial Appendix assumes that of the estimated $5.5 billion in Disputed Claims that will exist on the Consummation Date, only $415 million will be allowed ultimately. The liquidation analysis in the Financial Appendix estimates the aggregated allowed amount (including the $415 million in allowed amount arising from Disputed Claims) of senior Unsecured Claims against DBL Group approximates $1,911,722,000 including the intercompany payable to DBL Trading of approximately $517,637,000, and against DBL Trading of $460,668,000. [*Id.*]

The liquidation analysis in the Financial Appendix, as modified by the foregoing adjustments, sets a reasonable, if not optimistic, hypothetical Chapter 7 liquidation for each of DBL Inc., DBL Group, and DBL Trading (the Best Chapter 7 Case Analysis).

Without more, the Best Case Chapter 7 Liquidation Analysis clearly establishes that Creditors holding Allowed Claims in DBL Trading Class 3 receive more under the Plan than under the hypothetical Chapter 7 liquidation of DBL Trading. [Financial Appendix at 8, 29].

It is reasonable, necessary, and appropriate, however, to adjust the Best Case Chapter 7 Liquidation Analysis in light of the

following factors, to produce a Realistic Chapter 7 Case Analysis:

(a) *Increased Allowance of Disputed Claims* —any increase likely in the amount by which ultimately allowed Disputed Claims exceed $415 million attributable to conversion to Chapter 7;

(b) *Liquidated SLC Claims and Costs* —the likely allowed amount of the Securities Litigation Claims, together with the litigation costs associated with defending and liquidating such Claims ( ); and,

(c) *Additional Allowed Claims* —the allowed amount of new and additional Claims or increased amended amount of existing Claims that would be filed against the Debtors prior to the expiration of the new bar date that would be fixed in the Chapter 7 cases. [Gruenberger Aff. ¶¶ 7–10].

In the case of DBL Group, if the total of (a) the Liquidated SLC Claims and Costs, and (b) the Additional Allowed Claims exceeds $20,300,000, the senior unsecured Creditors of DBL Group receive more under the Plan than they would under the Realistic Chapter 7 Liquidation Analysis, without considering the Increased Allowance of Disputed Claims. [Wright Aff. ¶¶ 56, 57].

In the case of DBL Inc., if the sum of (a) the Liquidated SLC Claims and Costs, and (b) the Additional Allowed Claims exceeds $1,182,700,000, senior unsecured Creditors of DBL Inc. receive more under the Plan than they would under the Realistic Chapter 7 Liquidation Analysis, without considering the Increased Allowance of Disputed Claims. [*Id.*]

There are 850 Securities Litigation Claims filed against DBL Inc., and almost as many filed against DBL Group, on various theories of joint and several liability. [Gruenberger Aff. ¶¶ 7–8]. After eliminating duplicate and defective Claims, the Securities Litigation Claims have a stated value of $20 billion, including over 100 different prepetition actions containing securities law claims pending in 18 different jurisdictions before 60 different Judges. [*Id.* at ¶¶ 5–8].

In Chapter 7, the probability that plaintiffs could successfully prosecute these Claims would be enhanced by:

(a) the severely crippled ability in Chapter 7 to defend against such Claims;

(b) the probability that the 100 pending lawsuits would continue with Drexel having to defend in each such action;

(c) the likelihood that most, if not all such Claims would be tried before a jury; and,

(d) the impact upon juries of the Consent Decree, the guilty pleas entered by Michael Milken before U.S. District Judge Kimba Wood in April 1990, the criminal materials that were the subject of the *Fatico* hearing before Judge Wood late in 1990 in considering the sentence of Michael Milken, as well as the likely relevance to Drexel's conduct of the conduct of other convicted felons or wrong-doers such as Ivan Boesky, Dennis Levine, Martin Siegel, Charles Keating, David Paul, Thomas Spiegel, and Fred Carr, among others, and the effect of such matters upon jury awards.

[*Id.* at ¶ 12–16].

With respect to Additional New Claims, the Debtors have already expunged a substantial number of late filed claims against DBL Inc. and DBL Group. [DBL Group Docket Nos. 2895, 3091 and 3882]. In addition, relying upon the November 15, 1990 bar date fixed in these Chapter 11 cases, certain Securities Litigation Claimants, such as FDIC and RTC, were denied leave to file new Claims or amend and increase their Claims against DBL Inc. and DBL Group to incorporate substantial additional liabilities. [DBL Group Docket No. 1294].

It is quite likely, if not almost certain, that if the Disputed Claims, the Securities Litigation Claims, and any Additional New Claims were litigated to a conclusion, the aggregate sum of the liquidated amount of the Increased Allowance of Disputed Claims, the Liquidated SLC Claims and Costs and the Additional Allowed Claims, would exceed $1.6 billion against each of DBL Inc. and DBL Group for purposes of the Realistic Chapter 7 Liquidation Analysis. [Gruenberger Aff.; Gruenberger testi-

mony at March 5, 1992 confirmation hearing].

Under a Realistic Chapter 7 Liquidation Analysis, the senior unsecured Creditors of DBL Group receive more under the Plan than they would receive in a liquidation of DBL Group under Chapter 7. [Wright Aff. ¶¶ 56, 57 & Exhibit B]. Under a Realistic Chapter 7 Liquidation Analysis, the senior unsecured Creditors of DBL Inc. receive more under the Plan than they would receive in a liquidation of DBL Inc. under Chapter 7. [*Id.* at Exhibit B].

## X.

### Conditions Precedent

All conditions precedent to confirmation of the Plan that are set forth in § 11.1 of the Plan have been waived or deemed satisfied by the Plan Proponents, except for the conditions set forth in § 11.1.10 of the Plan, other than § 11.1.10.c. [Joint Statement ¶¶ 1–13]. The conditions set forth in § 11.1.10, other than those in § 11.1.10.c, which have already been satisfied, will be satisfied by entry of these findings and/or entry of the order confirming the Plan.

## XI.

### Miscellaneous

### A.

#### *Release and Injunction Provisions*

Claims against the following parties are, with certain exceptions, to be released upon Confirmation of the Plan (Release Provisions):

(a) identified current and former officers and other employees and the members of the various Committees, known as Identified Officers, Directors and Other Parties, who have provided and continue to provide benefits to these Debtors, their estates, creditors and Equity Interest holders; and,

(b) Identified Settling Parties.

[Sorte Aff. ¶¶ 166–67].

Identified Settling Parties are those persons or entities identified in the notice of settlement, dated February 14, 1992, that was served, *inter alia,* upon all creditors and Equity Interest holders, that (a) have reached a settlement with the Pool Administrators, and, (b) were found by the District Court, on March ____, 1992, after opportunity to be heard, to provide a material benefit to the Debtors' estates and Consummation of the Plan. [*Id.* at ¶ 167].

Such Identified Officers, Directors, and Other Parties and Identified Settling Parties are the beneficiaries of an injunction barring the pursuit of Drexel-related claims against any individual covered by the Release Provisions (Release and Injunction Provisions). The claims affected by the Release and Injunction Provisions, as well as the Release and Injunction Provisions themselves, clearly form an integral part of this reorganization.

The Debtors' ability to reorganize is dependent upon the Release and Injunction Provisions. The following concrete, adverse effects will occur in the absence of the Release and Injunction Provisions:

—There will be no Plan, and conversion to Chapter 7 will likely ensue;

—Piecemeal dismemberment of estate assets, reductions in distributions of property of the estates, and increased costs to creditors will result from an avalanche of suits against officers, directors, employees, agents, and others related to Drexel.

—There will be great risk of successful indemnity Claims, of liability being imputed to the Debtors from the liability established against any of the Identified Settling Parties or Identified Officers, Directors and Other Parties, and of Claims over and for contribution being augmented, established and liquidated against the Debtors.

—The Debtors' reorganization efforts will lose personnel, their cooperation, and the cooperation of others, all of which are essential to the Debtors' reorganization, due to the threat or reality of litigation arising out of their affiliation with Drexel.

—The Debtors' estates will lose the contributions of the Identified Settling Parties, a substantial source of funds that

may yield hundreds of millions of dollars to be used in reorganization under the Plan.

—Creditors and Equity Interest holders will lose the substantial benefits flowing to the estates as a result of the Claims Agreement.

—The Debtors' assets will return less value for the estates if liquidated under Chapter 7 than they will under the Plan.

—Finally, Debtors' liabilities will mushroom as the result of overwhelming multiple jury litigations in which Drexel's ability to defend is severely crippled by virtue of Chapter 7.

Inclusion of the Release and Injunction Provisions will permit the Plan to be confirmed and consummated, conferring material benefits upon these estates, Creditors, and Equity Interest holders.

The Release and Injunction Provisions effectively channel the Debtors' recoveries from the Pooled Contingent Assets, the Drexel Civil Disgorgement Fund and, possibly, the Milken Civil Disgorgement Fund into a fund or pool from which claims arising from Drexel's activities and business can be satisfied. The estates of these Debtors are augmented because:

(a) Fixed Creditor Recoveries are channeled into the 85%, 60% and 50% sliding scale distributions, payable by the Trust, DPI, and other Plan Entities, plus 14% of the net pooled recoveries realized by the Pool Administrators; and,

(b) the Securities Litigation Claimants' recoveries are channeled into the 15%, 40% and 50% sliding scale payable by the Trust, DPI, and other Plan Entities; 86% of the net pooled recoveries of the Pool Administrators; and the Drexel Civil Disgorgement Fund and the Milken Civil Disgorgement Fund.

[See Gruenberger Aff. I generally].

The Release and Injunction Provisions are essential to implementing and consummating the Plan, and providing Plan distributions to Creditors. The ever-increasing number, size, and cost of Drexel-related claims must end if these estates are to provide meaningful recoveries to Creditors in a fair, economical and equitable manner without threat of disruption or dismemberment of these Chapter 11 Estates through back door litigation against parties having claims over or indemnity claims against these Debtors. [Id.]

The Release and Injunction Provisions do not use the discharge of these Debtors to effect a release of third party guarantors or similar codebtors.

### B.

#### Executory Contracts

The Debtors have engaged in a thorough review of the executory contracts and unexpired leases to which any of the Debtors is party. The executory contracts listed on Exhibit T to the Plan may be necessary to the operation of the Plan Entities.

Assumption of any of the executory contracts or unexpired leases to which any of the Debtors is a party, other than those listed on Exhibit T to the Plan, would impose an onerous burden on the estates.

### C.

#### Profit Sharing Plan and Stock Bonus Plan

Neither the Trust nor DPI is an employee with respect to the Profit Sharing Plan or the Stock Bonus Plan.

### <<<OBJECTIONS>>>

Numerous objections [5] have been filed in opposition to confirmation of the Plan by the parties. For brevity, we summarize each objectant's objection:

References to exhibits in the table of objections refer to exhibits to Debtors' pleadings, which are a part of the record. Other filed objections not raised here were resolved following our post-disclosure hearing/pre-confirmation scheduling orders.

---

**5.** The United States of America, on behalf of the Internal Revenue Service (IRS), filed an objection to confirmation of the Plan, dated February 21, 1992 (IRS Objection). This objection was settled by stipulation of the parties.

Barry L. Klein (Klein), Exhibit "L"—

Klein is inappropriately classified as a DBL Group Class 6C Claim in violation of §§ 1122, 1123(a)(4) and 1129(a)(1).

Post-confirmation releases and injunctions improperly protect various individual defendants from liability while failing to grant Klein the same relief.

Citibank, N.A.; Chemical Bank, and First National Bank of Chicago (Banks), Exhibit "A"—

The Plan violates §§ 1123(a)(4) and 1129(a)(1) by failing to give Banks the periodic distributions which similarly situated creditors receive.

Section 1123(a)(4) is violated because Banks do not receive the reserve protection received by holders of DBL Inc. Class 3 Claims who have filed formal objections.

The Banks, as impaired creditors, have not accepted the Plan. The Debtors have not demonstrated that the § 1129(a)(7)(A)(ii) best interests test is met as to the Banks.

The Debtors have failed to modify the Plan, and, therefore, the Plan is unconfirmable.

Citibank, N.A.; Den Danske Bank, Lloyds Bank PLC and Canadian Imperial Bank of Commerce (Citibank), Exhibit "C"—

These creditors filed protective objections to preserve their objections to the Claims Agreement and their pending appeal of the Order approving that agreement.

Gary S. Davis (Davis), Exhibit "D"—

Asserts various releases and injunctions are improper, and to his prejudice.

The Debtors fail to adequately describe basis for classifying his claim as a DBL Group Class 6C claim, and he is improperly classified.

Hart Holding Company Incorporated and Reeves Industries, Inc. (Hart), Exhibit "F"—

These creditors filed a protective objection to preserve their objections to the Claims Agreement and their pending appeal of the Order approving that agreement.

Insurance Commissioner of State of California (Commissioner), Exhibit "H"—

DBL Inc. Class 1B claims are impaired, because they will not be paid in cash on or before the Consummation Date.

Judith D. Freedman (Freedman), Exhibit "E"—

Fiduciaries to various employee compensation plans are improperly granted releases under the Plan.

Liggett Group, Inc. and the Liquid Green Trust (Liggett), Exhibit "N"—

The Plan incorporates the Claims Agreement, which is fatally defective.

The Plan makes no provision for the proper treatment of their claims in the event the Claims Agreement is disapproved on appeal.

The Plan does not provide an escrow in an amount sufficient to protect their claims.

New York State Department of Taxation and Finance (the State), Exhibit "P"—

Post-confirmation releases and injunctions are not proper and deprive the State of an alternative source for collection of unpaid taxes.

The City of New York (City), Exhibit "P"—

Post-confirmation releases and injunctions are not authorized and improperly relieve certain parties from personal liability for various taxes.

Robert M. Rubin (Rubin), Exhibit "S"—

Various releases and injunctions are improper and will substantially prejudice Rubin.

Rubin's claim is improperly classified as a DBL Group Class 6C Claim.

Stephen J. Prince (Prince), Exhibit "Q"—

Prince's claim is improperly classified, and the claims as listed on his ballot improperly list either the amount of his claim and/or the Debtor against which such claim was filed.

Howard Brenner; Maurits Edersheim, Steven Edersheim, David Garfinkel, Roger Jospe and Edwin Kantor (Brenner Claimants), Exhibit "B"—

The Plan provides unequal treatment for claimants in the same class.

The Plan provides an inadequate reserve for unliquidated claims.

The Plan negates claimants' rights to reconsider their claims.

Edwin Kantor (Kantor), Exhibit "J"—

The Plan improperly classifies Kantor's claim as a DBL Group Class 7, rather than a DBL Group Class 4 Claim.

The Plan is not confirmable because of improper classification under § 1122(a).

Claimants represented by the law firm of Shereff Friedman, Hoffman & Goodman (Shereff Claimants), Exhibit "T"—

The Plan improperly provides for distribution of property that is not property of the estate.

Certain compensation claims are improperly classified.

The Plan unfairly discriminates against indemnification claims.

The Plan improperly subordinates certain of their secured claims in violation of § 510(b).

Lambert Brussels Assoc. Ltd. Partnership (LBA), Exhibit "M"—

The Plan does not comply with the mandatory subordination requirements of § 510(b).

The Plan lacks an escrow for the LBA disputed claims. The Plan unfairly discriminates between DBL Group Classes 8 and 9.

The releases and injunctions in favor of the Equity Committee members and counsel are improper.

The Equity Committee and its counsel have breached their fiduciary duties.

Perry S. Rotkowitz (Rotkowitz), Exhibit "R"—

Rotkowitz's claim is improperly classified, and the claim as listed on his ballot improperly list either the amount of his claim and/or the Debtor against which such claim was filed.

Seventy-seven alleged former employees of DBL Trading (Individual Employees), Exhibit "G"—

The Plan unfairly discriminates.

Oppenheimer & Co. for Richard Kates (Kates), Exhibit "K"—

Kates failed to receive a ballot.

George C. Mask (Mask), Exhibit "O"—

Reclassification of Mask's Priority Claim as an Unsecured Claim is improper.

At hearings, by bench ruling, or by separate memorandum of decision, all objections to the Plan were resolved by withdrawal, stipulation, or dismissal for lack of prosecution. We briefly address the objections listed above.

The objections of Klein, Rubin, and Davis with respect to the release and injunction provisions were overruled by us from the bench on March 3, 1992. We relied on our February 13, 1992 bench ruling dismissing a similar objection filed by the National Bank of Yugoslavia (apparently now settled). We have ample authority in this Circuit to approve a release and injunction provision. *See, In re Johns–Manville Corp.*, 801 F.2d 60, 63–64 (2d Cir.1986). As to the objections under §§ 1122, 1123(a)(4), and 1129(a)(1) to perceived improper classifications, we find the Plan does not unfairly discriminate because Klein, Rubin, and Davis are treated like all creditors and equity holders in their class. Moreover, these objections misconstrue § 502(e)(1)(B). It is the Bankruptcy Code, § 502(e)(1)(B), not the Plan, that bars their claims.

The claims of Banks, City, and State were withdrawn by stipulations. Kantor was withdrawn without stipulation. The Brenner claimants, objections Exhibit "B", except Garfinkel, were withdrawn. Garfinkel failed to prosecute, and thus the objection was dismissed. Citibank's objection was a reservation of right objection to a claims agreement, not a Plan objection, and thus required no ruling from us.

Liggett, Hart, and Citibank, Exhibit "C," were denied on the record. We found no requirement that an escrow be created for a pending appeal; no requirement that an agreement on appeal be assumed reversible for Plan purposes; and hold that the paramount interests of the majority of creditors required that the objections be overruled. Other findings and conclusions were made on the hearing record.

Freedman and Mask failed to appear to present their objections, which were dismissed for failure to prosecute.

Prince, Rotkowitz, and the Individual Employees have agreed to withdraw their objections. Without concession, the Debtors have agreed to review their claims.

The Commissioner's claim is not an objection to the Plan, but a request for an administrative class payment. Counsel for Commissioner was directed to file an application for and administrative claims payment.

The Shereff Claimants' "B" and "C" objections will be settled as part of the Employee ERISA/Compensation Claims Settlement. Their "A" objection is expected to be settled when they become Identified Settling Parties in connection with Securities Litigation Claims Settlement, or in the context of a previously filed adversary proceeding. The "D" objections are not confirmation issues, and no decision is required of us.

Finally, the LBA objections were decided by two Memoranda of Decision dated March 4, 1992, which overruled all of their objections.

With all objections to the Plan disposed of, we now move to a discussion of the applicable law.

### < < < DISCUSSION > > >

Section 1129(a)(1) of the Bankruptcy Code,[6] requires that a plan "compl[y] with the applicable provisions of [title 11]." 11 U.S.C. § 1129(a)(1). The legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan. H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. *See, In re Johns–Manville Corp.*, 68 B.R. 618, 629 (Bkrtcy.S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987). *See also, In re Toy & Sports Warehouse,*

*Inc.*, 37 B.R. 141, 149 (Bkrtcy.S.D.N.Y. 1984).

### I.

#### Section 1122(a)

■ Section 1122(a) provides that a plan may place a claim or interest in a particular class if such claim or interest is substantially similar to the other claims or interests of such class. Under § 1122(a), the relevant inquiry is whether all claims of a class have substantially similar rights to the debtor's assets. A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar. *See, In re AG Consultants, Grain Division, Inc.*, 77 B.R. 665, 676 (Bkrtcy.N.D.Ind.1987); *In re Jersey City Medical Center*, 817 F.2d 1055, 1060–61 (3d Cir.1987); *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 586 (6th Cir.1986); *In re LeBlanc*, 622 F.2d 872, 879 (5th Cir. 1980), *reh'g denied*, 627 F.2d 239 (5th Cir. 1980). In addition, § 1122(b) of the Bankruptcy Code provides that "[a] plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b).

Courts frequently interpret § 1122 to permit separate classification of different groups of unsecured claims where a reasonable basis existed for the classification. *See, e.g., In re AG Consultants, supra,* 77 B.R. at 675, and cases collected therein. Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes. *Id.,* at 674. *See, e.g., Jersey City Medical Center,* 817 F.2d at 1060 ("The express language of [§ 1122] explicitly forbids a plan from placing dissimilar claims in the same class; it

---

**6.** All statutory references are to Title 11, the United States Bankruptcy Code, unless otherwise noted.

does not, though, address the presence of similar claims in different classes."). *See, e.g., U.S. Truck Co., supra,* 800 F.2d at 586.

## II.

### Section 1123

Under § 1123, a Chapter 11 plan of reorganization may include provisions for the settlement of claims against the estate. Specifically, § 1123(b)(3)(A) provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).

Cases decided under F.R.Bkrtcy.P. 9019 grant us broad authority to approve compromises and settlements. Compromises are favored by the Courts, *In re New York, N.H. & H.R. Co.,* 632 F.2d 955, 959–960 (2d Cir.1980), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980); *Matter of Jackson Brewing Co.,* 624 F.2d 599, 604 (5th Cir.1980), because they allow the estate to avoid the expenses and burdens associated with litigating contested claims. *In re Walsh Constr., Inc.,* 669 F.2d 1325, 1328 (9th Cir.1982).

■ The standards for approval are well settled and require the Court to inquire into the reasonableness of the proposed settlement. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1, *reh'g denied,* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968); *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.1983), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 493, 496–97 (Bkrtcy. S.D.N.Y.1991); *Florida Trailer Equip. Co. v. Deal,* 284 F.2d 567, 571 (5th Cir.1960). The inquiry under the Bankruptcy Code (as well as under the Bankruptcy Act) need only determine whether the settlement falls below the lowest point of the range of reasonableness. *In re Teltronics Serv., Inc.,* 762 F.2d 185, 189 (2d Cir.1985); *In re W.T. Grant Co., supra,* 699 F.2d at 608; *In*

*re Drexel Burnham Lambert Group, Inc., supra,* 134 B.R. at 496–97.

■ In determining whether a settlement falls below the range of reasonableness, a Court should balance the following factors:

1. the probability of success in litigation in comparison to the present and future benefits offered by the settlement;

2. the prospect of complex and protracted litigation if the settlement is not approved;

3. the degree to which the settlement is supported by parties in interest;

4. the competency and experience of counsel who support the settlement;

5. the relative benefits to be received by members of any affected class;

6. the nature and breadth of releases to be obtained by officers and directors; and

7. the extent to which settlement is the product of arm's length bargaining.

*In re Drexel Burnham Lambert Group, Inc., supra,* 134 B.R. at 497, *citing, In re Texaco, Inc.,* 84 B.R. 893 (Bkrtcy.S.D.N.Y. 1988), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y.1988). Other Courts have held that the following factors are relevant: (1) the probability of success in the litigation; (2) the difficulties of collecting any litigated judgments; (3) the complexity of the litigation and the expense, inconvenience and delay necessarily attending it; and (4) the interests of the creditors and interest holders of the estate. *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929); *In re Lion Capital Group,* 49 B.R. 163, 175 (Bkrtcy. S.D.N.Y.1985); *In re Carla Leather, Inc.,* 44 B.R. 457, 466 (Bkrtcy.S.D.N.Y.1984), *aff'd,* 50 B.R. 764 (S.D.N.Y.1985).

■ While a Court may consider the objections of parties in interest who oppose a proposed settlement, such objections certainly are not controlling. *In re A & C Properties,* 784 F.2d 1377, 1382 (9th Cir.), *cert. denied,* 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986); *In re Transcontinental Energy Corp.,* 764 F.2d 1296, 1299 (9th Cir.1985); *In re Bell & Beckwith,* 77 B.R.

606, 612 (Bkrtcy.N.D.Ohio 1987), *aff'd,* 87 B.R. 472 (Bkrtcy.N.D.Ohio 1987). A Court may properly give weight to the debtor's informed judgment that a settlement is fair and reasonable and consider the competency of the counsel who favor the compromise. *In re International Distrib. Centers, Inc.,* 103 B.R. 420, 423 (S.D.N.Y.1989); *see, In re Carla Leather, supra,* 44 B.R. at 472.

■ Approval of a settlement does not require a "mini trial" on the merits. *See, In re Drexel Burnham Lambert Group, Inc., supra,* 134 B.R. at 496; *In re Blair,* 538 F.2d 849, 851–852 (9th Cir.1976); *In re International Distrib. Centers, Inc., supra,* 103 B.R. at 423; *In re Heissinger Resources Ltd.,* 67 B.R. 378, 383 (C.D.Ill. 1986); *In re Holywell Corp.,* 93 B.R. 291, 295–296 (Bkrtcy.S.D.Fla.1988). Rather than being forced to decide all questions of law and fact that are settled, a Court need only "canvass the issues [to] see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.' " *In re Teltronics Serv., Inc., supra,* 762 F.2d at 189, *quoting, In re W.T. Grant Co., supra,* 699 F.2d at 608. *Accord, In re Lion Capital Group, supra,* 49 B.R. at 175.

### III.

### Section 1129(a)(2)

Section 1129(a)(2) requires that the plan proponent "compl[y] with the applicable provisions of [title 11]." 11 U.S.C. § 1129(a)(2). The legislative history to § 1129(a)(2) explains that this provision embodies the disclosure and solicitation requirements under §§ 1125 and 1126. *See, In re Johns–Manville Corp.,* 68 B.R. 618, 630 (Bkrtcy.S.D.N.Y.1986); *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bkrtcy.S.D.N.Y.1984); H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S.Rep. No. 989, 95th Cong.2d Sess. 126 (1978), U.S.Code Cong. & Admin.News 1978, pp. 6368, 5912 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as § 1125 regarding disclosure.").

### IV.

### Section 1129(a)(3)

Section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Second Circuit has defined the good faith standard as requiring a showing that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.' " *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988), *quoting, Koelbl v. Glessing (In re Koelbl),* 751 F.2d 137, 139 (2d Cir.1984) (*quoting, Manati Sugar Co. v. Mock,* 75 F.2d 284, 285 (2d Cir.1935)). Generally, a plan is proposed in good faith " 'if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.' " *In re Texaco Inc., supra,* 84 B.R. at 907, *quoting, Hanson v. First Bank of South Dakota,* 828 F.2d 1310, 1315 (8th Cir.1987) (*quoting, In re Toy & Sports Warehouse, Inc., supra,* 37 B.R. at 149). *See also, Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.),* 709 F.2d 762, 764 (1st Cir.1983) ("{A} chapter 11 reorganization plan must be submitted in good faith.... That is to say, there must be some relation—at least an arguable relation—between the chapter 11 plan and the reorganization-related purposes that the chapter was designed to serve.") (Citations omitted); *In re Jorgensen,* 66 B.R. 104, 109 (9th Cir. BAP 1986) (a Chapter 11 plan is filed in good faith if the plan proponent has exhibited "a fundamental fairness in dealing with [the] creditors" and if the plan "will achieve a result consistent with the objectives and purposes of the Code").

The primary goal of Chapter 11 is to promote the restructuring of a troubled company. Congress has recognized that the continuation of the operations of a debtor's business as a viable entity benefits the national economy through the preservation of jobs and continued production of goods and services. The United States Supreme Court has similarly recognized:

The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.

*NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984).

## V.

### Section 1129(a)(4)

Section 1129(a)(4) requires that payments for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, have either been approved, or are subject to approval, by this Court as reasonable. All payments within the scope of § 1129(a)(4) may only be made with Court approval. (*See, e.g.,* Plan §§ 3.1, 13.4).

## VI.

### Section 1129(a)(5)

Section 1129(a)(5)(A)(i) requires the proponent of a plan to disclose the identity of certain individuals who will hold positions with the debtor or its successor after confirmation of the plan. Section 1129(a)(5)(A)(ii) requires that the service of such individuals be "consistent with the interests of creditors and equity security holders and with public policy." *In re Apex Oil Co.*, 118 B.R. 683, 704–05 (Bkrtcy. E.D.Mo.1990) (§ 1129(a)(5)(A)(ii) is satisfied where debtors as well as creditors' committee believe control of entity by proposed individuals will be beneficial); *In re Toy & Sports Warehouse, Inc., supra,* 37 B.R. at 149–50, 151 (continuation of debtors' president and founder, who had many years of experience in the debtors' business, satisfied § 1129(a)(5), and enhanced feasibility of plan).

Section 1129(a)(5)(B) requires a plan to disclose the identity of any "insider" to be employed or retained by the reorganized debtor and the "nature of any compensation" for such insider. *In re Apex Oil Co., supra,* 118 B.R. at 704–05 (§ 1129(a)(5)(B) is satisfied where plan fully disclosed that certain insiders will be employed by reorga-nized debtor and the terms of employment of such insiders); *In re Texaco, Inc., supra,* 84 B.R. at 908 (requirements of § 1129(a)(5)(B) are satisfied where plan discloses debtors' existing officers and directors who will continue to serve in office after plan confirmation).

## VII.

### Section 1129(a)(6)

Section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in the plan. *See,* 11 U.S.C. § 1129(a)(6). The foregoing provision is inapplicable here because the Debtors and the reorganized entities contemplated by the Plan do not charge rates that are regulated by a governmental agency.

## VIII.

### Section 1129(a)(7)

Section 1129(a)(7) of the Bankruptcy Code requires that a plan provide as follows:

> With respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or
>
> (B) if section § 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's

interest in the property that secures such claims.

11 U.S.C. § 1129(a)(7).

■ The best interests test focuses on individual creditors rather than classes of claims. *See, In re Toy & Sports Warehouse, Inc., supra,* 37 B.R. at 150. The test requires that each holder of a claim or interest either accept the plan or receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under Chapter 7. *Id.*

Thus, under the best interests test, a Court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated." *In re Victory Constr. Co., Inc.,* 42 B.R. 145, 151 (Bkrtcy.C.D.Cal.1984). *See also, In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 297 (Bkrtcy.S.D.N.Y.1990); *In re Northeast Dairy Co-op. Fed'n, Inc.,* 73 B.R. 239, 253 (Bkrtcy.N.D.N.Y.1987). As § 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting impaired claims or interests. If a class of claims or interests unanimously accepts the plan, then the best interests test is automatically satisfied for all members of that class. Moreover, under § 1126(f),[7] a class that is not "impaired" under the plan is deemed to have accepted the plan.

### IX.

#### Sections 1129(a)(8) and 1129(b)

Subject to the exceptions contained in § 1129(b), a plan must be accepted by all impaired classes. *See,* 11 U.S.C. § 1129(a)(8)(A). Based upon the vote tabulation, with the exception of LBA, all impaired classes of Claims and Equity Interests have voted in favor of the Plan. Thus, as to those accepting classes of Claims and Equity Interests, the requirements of § 1129(a)(8) have been satisfied. With re-

spect to LBA, except for § 1129(a)(8), all of the requirements of § 1129(a) have been satisfied. Moreover, the requirements of § 1129(b) have been satisfied with respect to LBA because the Plan is fair and equitable and does not discriminate unfairly. 11 U.S.C. § 1129(b). *See, In re Drexel Burnham Lambert Group, Inc.,* "Memorandum of Decision on § 1129(b) Objection to Plan Confirmation," Slip Op. dated March 4, 1992 (Conrad, J.).

### X.

#### Section 1129(a)(9)

Section 1129(a)(9) contains a number of requirements concerning the payment of priority claims. The Plan satisfies the requirements of all three subsections of § 1129(a)(9). As required by § 1129(a)(9)(A) of the Bankruptcy Code, § 3.1 of the Plan provides for payment in full of Administrative Claims in Cash on or before the later of the Consummation Date or the date on which an Administrative Claim is allowed. As required by § 1129(a)(9)(B) of the Bankruptcy Code, §§ 6.1, 7.1 and 8.1 of the Plan provide that Priority Claims of each Debtor will be paid on the Consummation Date in Cash and in full, subject to the satisfaction of the Withholding Requirement for such Claims that are Compensation Claims.

### XI.

#### Section 1129(a)(10)

Section 1129(a)(10) provides that at least one impaired class of claims must accept the plan, without including the acceptance of the plan by any insider. The Plan has been accepted by at least one class of impaired Creditors or Equity Interest holders of each of DBL Group, DBL Inc., and DBL Trading who are not insiders.

---

**7.** Section 1126(f) provides that:

Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interest of such class is not required.

XII.

Section 1129(a)(11)

Section 1129(a)(11) requires us to find that the Plan is feasible as a condition precedent to confirmation. Specifically, we must determine that:

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

■ The feasibility test set forth in § 1129(a)(11) requires us to determine independently whether the Plan is workable and has a reasonable likelihood of success. *See, In re Texaco Inc., supra,* 84 B.R. at 910; *In re Johns–Manville Corp., supra,* 68 B.R. at 635. ("A Bankruptcy Court, in determining the feasibility of a proposed plan of reorganization should 'scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable,'" *quoting, In re Monnier Bros.,* 755 F.2d 1336, 1341 (8th Cir.1985)); *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bkrtcy.D.N.J.1980). As noted in *Collier on Bankruptcy,* a guarantee of success is not required:

Basically, feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success. *It is not necessary that success be guaranteed,* but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success.

5 *Collier on Bankruptcy* ¶ 1129.02[11], at 1129–54 (15th ed. 1991) (Emphasis supplied). *See also, In re U.S. Truck Co., Inc.,* 47 B.R. 932, 944 (D.C.Mich.1985), *aff'd,* 800 F.2d 581 (6th Cir.1986) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed"); *In re Johns–Manville Corp., supra,* 68 B.R. at 635 ("The plan proponent is not required to *guarantee* the ultimate success of the reorganized company") (em-

phasis in original); *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bkrtcy.S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11).").

■ The key element of feasibility is whether there exists the reasonable probability that the provisions of the Plan can be performed. The Court in *In re Clarkson,* 767 F.2d 417 (8th Cir.1985), stated:

The Second Circuit has declared that the feasibility test contemplates "the probability of actual performance of the provisions of the plan.... The test is whether the things which are to be done after confirmation can be done as a practical matter...."

*Id.* at 420, *quoting, In re Bergman,* 585 F.2d 1171, 1179 (2d Cir.1978); *In re Greene,* 57 B.R. 272, 277–78 (Bkrtcy. S.D.N.Y.1986).

■ The purpose of the feasibility test is to protect against visionary or speculative plans. As noted by the Ninth Circuit:

The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

*Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.),* 761 F.2d 1374, 1382 (9th Cir.1985) (*quoting,* 5 *Collier on Bankruptcy* ¶ 1129.02[11], at 1129–54 (15th ed. 1991)). Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required. *See, In re U.S. Truck Co., Inc., supra,* 47 B.R. at 944.

Applying the above standards of feasibility, Courts have identified the following factors as probative:

1. the adequacy of the capital structure;
2. the earning power of the business;
3. economic conditions;
4. the ability of management;

5. the probability of the continuation of the same management; and,

6. any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Toy & Sports Warehouse, Inc., supra,* 37 B.R. at 151, *citing, In re Landmark at Plaza Park, Ltd., supra,* 7 B.R. at 659. *See also, In re Prudential Energy Co., supra,* 58 B.R. at 862–63. In examining these factors, Courts indicate that this list is neither exhaustive nor exclusive. *Cf., In re U.S. Truck Company, Inc., supra,* 800 F.2d at 589 ("This case is largely controlled by 'other related matter[s]' ").

The Plan incorporates a complex structure of entities carefully negotiated among the Plan Proponents to ensure the success and feasibility of the Plan. (Sorte Aff. ¶¶ 3–7). Notably, with the exception of certain Administrative Claims arising from the operation of the Plan Entities and the liability of the Plan Entities to the IRS for the Tax Claim of the IRS, the Plan is structured such that, after the Consummation Date, distributions to Creditors are to be made only as Cash is available. (*Id.* ¶¶ 132–135). Thus, with the noted exceptions, the Plan Entities will have no significant installment payment obligations that may raise questions of the feasibility of the Plan. In addition, the Plan and Exhibits thereto provide for the appropriate capitalization of the relevant Plan Entities and authorizations and powers to pay operating and other expenses thereof. (*See,* Plan Exhibits).

## XIII.

### Section 1129(a)(12)

Section 1129(a)(12) requires that certain fees listed in 28 U.S.C. § 1930, be: (1) determined by the Court at the hearing on confirmation of a plan; (2) paid; or, (3) other provision be made for payment. Section 3.1 of the Plan provides that such fees (which are included in the definition of Administration Claims) will be paid in Cash, in full, on the Consummation Date.

## XIV.

### Section 1129(a)(13)

Section 1129(a)(13) requires a plan to provide for the continuation of retiree benefits at levels established under § 1114 of the Bankruptcy Code. DBL Inc. is the only Debtor with retirees. DBL Inc. has continued to provide retiree benefits during the Chapter 11 Cases. Under the Plan, the retiree payments may be terminated at will. The Trustees will determine the extent to which retiree benefits postconsummation are to be funded. The classification and treatment of DBL Inc. Class 1C includes provisions for payments on behalf of allowed Retiree Benefits Claims. Such treatment meets the requirements of §§ 1114 and 1129(a)(13). *See, LTV Steel Co., Inc. v. United Mine Workers of America (In re Chateaugay Corp.),* 945 F.2d 1205 (2d Cir.1991), *cert. den.,* —— U.S. ——, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992); *In re Doskocil Companies, Inc.,* 130 B.R. 870 (Bkrtcy.D.Kan.1991); *In re Federated Dep't Stores,* 132 B.R. 572 (Bkrtcy. S.D.Ohio 1991).

## XV.

### Substantive Consolidation

The Plan provides for the substantive consolidation of the DBL Group Consolidating Subsidiaries into DBL Group, and the DBL Inc. Consolidating Subsidiaries into DBL Inc., but does not provide for the consolidation of DBL Group, DBL Inc., and DBL Trading because of their separate historical presentation to creditors and their independent regulatory requirements. Nevertheless, "Drexel Burnham Lambert" was a single enterprise operating through its many corporate entities.

██ Under controlling case law, there is more than adequate basis for the consolidations contemplated by the Plan. In the Second Circuit, *In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515 (2d Cir.1988) set out the applicable standard for approving a substantive consolidation. As articulated by the Second Circuit, Courts must examine various factors derived from earlier

case law in light of two critical concerns: First, "whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit,'" *id.*, at 518, *quoting,* 5 *Collier on Bankruptcy* ¶ 1100.06, at 1100–33; and, second, "whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Id.*[8] The facts of these Chapter 11 Cases encompass most, if not all, of the factors set forth in the case law and provide this Court with more than adequate grounds to approve the substantive consolidations contained in the Plan.

▪▪▪▪ The equitable doctrine of substantive consolidation permits a Court in a bankruptcy case involving one or more related corporate entities, in appropriate circumstances, to disregard the separate identity of corporate entities, and to consolidate and pool their assets and liabilities and treat them as though held and incurred by one entity. *See, Chemical Bank New York Trust Co. v. Kheel, supra,* 369 F.2d at 847. Substantive consolidation creates a single estate for the benefit of all creditors of all of the consolidated corporations and combines such creditors into one creditor body. *See, Stone v. Eacho (In re Tip Top Tailors, Inc.),* 127 F.2d 284, 289 (4th Cir. 1942), *reh'g denied,* 128 F.2d 16 (4th Cir. 1942), *cert. den.,* 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942). The Courts have invoked their broad equity power to order substantive consolidation after reviewing the facts on a case by case basis in light of the guidelines gleaned from prior case law. *See, Fish v. East,* 114 F.2d 177, 191 (10th Cir.1940); *In re Vecco Constr. Indus., Inc.,* 4 B.R. 407, 409 (Bkrtcy.E.D.Va.1980). Factors that Courts consider in ascertaining whether the interrelationship between the entities warrant consolidation include:

—assumption by the parent of contractual obligations of its subsidiaries;

—the sharing of overhead, management, accounting, and other related expenses among the different corporate entities;

—the existence of intercompany guarantees on loans;

—failure to distinguish between property of each entity;

—shifting of funds from one company to another without observing corporate formalities;

—parent paying salaries of employees of subsidiaries;

—the subsidiary having grossly inadequate capital;

—the degree of difficulty in segregating and ascertaining individual assets and liabilities;

—the presence of consolidated financial statements;

—the parent owning all or a majority of the capital stock of a subsidiary;

—the parent, its affiliates and the subsidiary having common directors or officers;

—the parent or its affiliates financing the subsidiary;

—the parent shifting people on and off the subsidiary's board of directors;

—the subsidiary having substantially no business except that with the parent or its affiliates or no assets except those conveyed to it by the parent or an affiliate;

—the parent referring to the subsidiary as a department or division;

—the directors of the subsidiary not acting independently in the interest of the subsidiary, but taking direction from the parent; and,

—the parent, its affiliates and the subsidiary acting from the same business location.

*See, e.g., Soviero, supra,* 328 F.2d at 447–448; *Stone, supra,* 127 F.2d at 286–88; and *Vecco, supra,* 4 B.R. at 410.

▪▪▪ The consolidation factors listed above, in no singular order of importance, must be evaluated within the larger context of balancing the prejudice resulting from the proposed consolidation against

---

**8.** *See, Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966); *Soviero v. Franklin Nat'l Bank of Long Island,* 328 F.2d 446, 448–49 (2d Cir.1964); *Matter of D.H. Over-* meyer Co., Inc., 2 BCD 412, 416–17 (Bkrtcy. S.D.N.Y.1976); *In re Commercial Envelope Mfg. Co., Inc.,* 3 BCD 647, 649–52 (Bkrtcy.S.D.N.Y. 1977).

the effect of preserving separate debtor entities. *In re Donut Queen, Ltd.*, 41 B.R. 706, 709–710 (Bkrtcy.E.D.N.Y.1984). Some Courts have held that the proponent of substantive consolidation must show that "the creditors will suffer greater prejudice in the absence of consolidation than the debtors (and any objecting creditors) will suffer from its imposition." *Holywell Corp. v. Bank of New York*, 59 B.R. 340, 347 (S.D.Fla.1986), *cert. den.*, 488 U.S. 823, 109 S.Ct. 69, 102 L.Ed.2d 46 (1988). *See, In re Snider Bros., Inc.*, 18 B.R. 230, 238 (Bkrtcy.D.Mass.1982). In considering the benefit to creditors that would result from substantive consolidation, Courts have focused on potential savings in costs and time by eliminating the need to disentangle the records and accounts of the debtors. The elimination of duplicate claims and the need to adjudicate the question of which debtor is liable have also been considered. *Kheel, supra*, 369 F.2d at 847. The financial benefit, if any, from consolidating the operations of the debtors has also been found to be relevant. *See, e.g., In re F.A. Potts & Co., Inc.*, 23 B.R. 569, 573 (Bkrtcy.E.D.Pa. 1982); *In re Interstate Stores, Inc.*, 15 CBC 634, 642 (Bkrtcy.S.D.N.Y.1978). Additionally, Courts have considered whether consolidation would enhance debtor rehabilitation and thereby produce a reorganized enterprise with greater profit potential. *See, e.g., In re Food Fair Inc.*, 10 B.R. 123, 127 (Bkrtcy.S.D.N.Y.1981).

Under the standards enunciated by the Second Circuit, substantive consolidation should be ordered where the inequalities of substantive consolidation are outweighed by the practical difficulties of tracing complex transactions between interrelated corporate entities. *See, Augie/Restivo, supra*, 860 F.2d at 519, "(s)ubstantive consolidation should be used only after it has been determined that all creditors will benefit because untangling is either impossible or so costly as to consume the assets." *Id. See also, Kheel, supra*, 369 F.2d at 847 (power to consolidate may be used "where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them [are] so substantial as to threaten the realization of any net assets for all the creditors....").

Some Courts have identified a current "liberal trend" in allowing substantive consolidation because of "increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business planning purposes." *Vecco, supra*, 4 B.R. at 409; *In re Murray Indus., Inc.*, 119 B.R. 820, 828–29 (Bkrtcy.M.D.Fla. 1990). *See also, Eastgroup Properties v. Southern Motel Assoc., Ltd.*, 935 F.2d 245, 248–49 (11th Cir.1991).[9]

---

**9.** In following this "liberal trend," the Eleventh Circuit in *Eastgroup* analyzed the existing case law construing substantive consolidation and enunciated a working formula for Courts to follow on a case by case basis. The Eleventh Circuit began its analysis by recognizing that substantive consolidation "'almost invariably redistributes wealth among the creditors of the various entities.'" *Eastgroup, supra*, 935 F.2d at 248 (*quoting, Drabkin v. Midland-Ross Corp. (In re Auto Train Corp.)*, 810 F.2d 270, 276 (D.C.Cir. 1987). "It is agreed that the basic criterion by which to evaluate a proposed substantive consolidation is whether 'the economic prejudice of continued debtor separateness' outweighs 'the economic prejudice of consolidation.'" *Eastgroup, supra*, 935 F.2d at 249 (*quoting, Snider, supra*, 18 B.R. at 234). "In other words, a court must 'conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties.'" *Id.* (*quoting, Auto Train, supra*, 810 F.2d at 276). To perform the analysis prescribed by *Eastgroup*, a Court

should impose a shifting burden. "[T]he proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit." *Id.* This showing creates the presumption that creditors did not rely on the separateness of the entities. *Id.* (Citations omitted). Having made this *prima facie* showing, substantive consolidation should be granted unless an objecting creditor can show that "(1) it has relied on the separate credit of one of the entities to be consolidated; *and* (2) it will be prejudiced by substantive consolidation." *Id.* (Citations omitted) (emphasis added). Finally, where an objecting creditor has made the necessary two-part showing, substantive consolidation may be ordered "only if [the court] determines that the demonstrated benefits of consolidation heavily outweigh the harm." *Id.* (Citations omitted). Notably, in *Eastgroup*, the Court narrowly construed the first prong of the

Applying the foregoing standards to the case *sub judice*, it is clear that the Debtors have established a *prima facie* showing supporting substantive consolidation. The Debtors were operated as a single enterprise. The myriad of issues that exist between and among the several Debtors that are resolved by the substantive consolidations and other Plan provisions would delay reorganization and distributions to Creditors for an indefinite period absent such consolidations. For example, substantial Claims in excess of $25 billion were filed against the Debtors jointly and severally. Establishing to whom actual liability, if any, should be allocated would be a herculean task [10] consuming years of costly professional services, thereby draining significant amounts of value from the Debtors' estates. The reorganization effort will be obstructed perhaps irreparably and certainly to the detriment of most if not all creditors of the Debtors by an effort to tease apart pieces of an integrated whole. The vast weight of the case law requires that economic realities must not be ignored merely to preserve the legal form of corporate entities, most particularly where such legal formalism will disadvantage the vast majority of creditors and endanger the Debtors' reorganization.

With only few and identifiable exceptions, the Drexel Operating Companies, the Drexel Investment Companies, and DBL Capital shared overhead, management, accounting, and related expenses with DBL Group or its wholly owned broker-dealer subsidiary DBL Inc. There were numerous and well known intercompany guarantees running from DBL Group to the Subsidiaries. DBL Inc., through DBL Group, employed and paid virtually all employees who performed services for the Debtors. Many of the Debtors did not publish unconsolidated financial statements. DBL Group owned all of the capital stock of all of the other Debtors. Many of the Drexel Oper-

ating Companies and the Drexel Investment Companies had officers and/or directors in common. DBL Group or DBL Inc. financed the activities of virtually all of the Debtors on an intercompany basis. DBL Group determined the persons who served as directors of virtually all of the Drexel Operating Companies, the Drexel Investment Companies, and DBL Capital. The Drexel Investment Companies had substantially no business other than business with or related to DBL Group and its Affiliates and no assets except those conveyed to it by DBL Group or DBL Group's Affiliates. The Drexel Operating Companies, the Drexel Investment Companies and DBL Capital represented, among other things, various lines of business for "Drexel Burnham Lambert" and were held out to the public as such. The directors of those companies took direction from and acted in the interests of the "Drexel Burnham Lambert" enterprise and all of the companies conducted their affairs from the same business locations.

Drexel Burnham Lambert (Asia) Ltd., Drexel Burnham Lambert Caribe International, Incorporated, and Drexel Burnham Lambert International, Inc. were organized solely as arms of DBL Inc., whose regulatory requirements demanded separate subsidiaries for certain of its trading and brokerage activities. They were formed to satisfy foreign and domestic regulations so that DBL Inc. could extend its activities into Japan, the Caribbean, and the United Kingdom.

A multitude of intercorporate legal issues an disputes are resolved by the Plan and the contemplated substantive consolidations. If not all, certainly most Creditors and Equity Interest holders will receive a lesser recovery from the Debtors' estates if substantive consolidation under the Plan is not approved. Among other things, failing consolidation, years of inter-

---

required objectant's showing reliance on the independent credit of the separate entities. The Court held that mere recognition by the objector of the entities separateness would not suffice to prove reliance. *Id.* at 251–52.

**10.** We pause here to note that in one adversary proceeding, *P.T. Tirtamas v. The Drexel Burn-*

*ham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* AP 90–5571A, discovery pertaining to one singular intercompany transaction took months to complete before it was up for adjudication.

corporate litigation can be anticipated merely to recover intercompany accounts, some of which may be subject to contractual or equitable subordination. Without the consolidation, no reorganized entity will emerge, thus thwarting a primary goal of the Bankruptcy Code—rehabilitation and reorganization. The emergence of the reorganized Debtors as New Street will also maximize distributions to Creditors by realizing increased recoveries on certain illiquid but strategic assets of the Debtors. Rather than some Creditors inexplicably receiving recoveries, and other Creditors and Equity Interest holders receiving no recoveries at all, substantive consolidation with joint ownership of New Street by all Creditors and participation by all Equity Interest holders is a large step toward another primary goal of the Bankruptcy Code—equality of distribution.

### <<<CONCLUSIONS OF LAW>>>

#### I.

The Plan Satisfies the Requirements of § 1123(a)(1) of the Bankruptcy Code

■ Section 1123(a)(1) provides that a plan must designate classes of claims and interests. The Plan adequately classifies all Claims and Equity Interests.

#### II.

The Plan Satisfies the Requirements of § 1122(a) of the Bankruptcy Code

Section 1122(a) states that a plan may place a claim or interest in a particular class if such claim or interest is substantially similar to the other claims or interests of such class. Section 1122(b) additionally provides that a plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the Court approves as reasonable and necessary for administrative convenience. A classification scheme satisfies § 1122 when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar.

The classification of Claims and Equity Interests in Article IV of the Plan is reasonable and necessary to implement the Plan and satisfies the requirements of § 1122.

#### III.

The Plan Satisfies the Requirements of § 1123(a)(2) of the Bankruptcy Code

In accordance with § 1123(a)(2), Article V of the Plan specifies the impaired and unimpaired classes. Each of DBL Group Classes 4, 5A, 5B, 6A, 6B, 6C, 7, 8 and 9; DBL Inc. Classes 4, 5, 6, 7A and 7B; and, DBL Trading Class 3 are impaired under the Plan. Each of DBL Group Classes 1, 2 and 3; DBL Inc. Classes 1A, 1B, 1C, 2 and 3; and, DBL Trading Classes 1 and 2 are unimpaired.

#### IV.

The Plan Satisfies the Requirements of § 1123(a)(3) of the Bankruptcy Code

In accordance with § 1123(a)(3), Article VI of the Plan specifies the treatment of each impaired class.

#### V.

The Plan Satisfies the Requirements of § 1123(a)(4) of the Bankruptcy Code

Section 1123(a)(4) requires a plan to provide the same treatment for each claim or interest of a particular class, unless the holder of the claim or interest agrees to less favorable treatment of such particular claim or interest.

The Plan provides the same treatment for each Claim or Equity Interest in each class.

#### VI.

The Plan Satisfies the Requirements of § 1123(a)(5) of the Bankruptcy Code

Satisfying § 1123(a)(5), Article X of the Plan provides adequate means for implementing the Plan.

## VII.

### The Plan Satisfies the Requirements of § 1123(a)(6) of the Bankruptcy Code

Section 1123(a)(6) requires a plan to provide for the inclusion in the charter of a debtor, if a debtor is a corporation, or of any corporation to which a debtor transfers all or any party of a debtor's estate, or with which the debtor has merged or consolidated, a provision prohibiting the issuance of nonvoting equity securities.

DBL Group's charter and by-laws will be amended to restrict the issuance of nonvoting equity securities and each of the charters of DBP Corp., DPI–A Corp., and DPI–B Corp., and will include a provision prohibiting the issuance of nonvoting equity securities.

Section 1123(a)(6) also requires a plan to provide, as to the several classes of securities of the reorganized entity possessing voting power, for an appropriate distribution of power among such classes in accordance with § 1123(a)(6). This requirement of § 1123(a)(6) has been satisfied by the Plan because none of New Street, DBP Corp., DPI–A Corp., and DPI–B Corp., will issue classes of securities having different entitlement for purposes of § 1123(a)(6).

## VIII.

### The Plan Satisfies the Requirements of § 1123(a)(7) of the Bankruptcy Code

In accordance with § 1123(a)(7), the Plan and the agreements attached thereto provide for the selection of the Trustees, board of directors, and management of New Street; and the directors, officers, or trustees of any other Plan Entity, and any successor to such officers, directors, or trustees, in a manner consistent with the interests of creditors and equity security holders and with public policy.

## IX.

### The Rejection of Executory Contracts and Unexpired Leases under § 1123(b)(2) of the Bankruptcy Code is in the Best Interests of the Debtors' Estates

The Plan constitutes and incorporates a motion by the Debtors to reject all executory contracts to which any of the Debtors are parties as of the Consummation Date, except those executory contracts listed on Exhibit T.

The Debtors' decisions regarding the rejection of executory contracts, as reflected in the Plan, are based on and are within the sound business judgment of the Debtors and are in the best interests of the Debtors and their respective estates.

## X.

### All Settlements and Compromises Incorporated in the Plan Pursuant to § 1123(b)(3) are Reasonable, Fair and Equitable and in the Best Interests of the Debtors' Estates

We are required to make an independent determination of the fairness to the Debtors and their estates of each of the settlements embodied in a plan.

In approving each compromise and settlement of potential claims, we have considered:

A. The balance of the likelihood of success of claims asserted by the claimants against the likelihood of success of the defenses or counterclaims possessed by the Debtors;

B. The balance of the likelihood of success of claims asserted by the Debtors against the likelihood of success of the defenses or counterclaims possessed by the claimants;

C. The complexity, cost and delay of litigation that would result in the absence of settlements;

D. Whether any creditor or party in interest has objected to the settlement and the acceptance of the Plan by a substantial majority of the holders of claims; and,

E. The fact that the Plan, which gives effect to the settlements, is the product of extensive arm's length and good faith negotiations among the Plan Proponents.

Each of the settlements fall within a range of reasonableness for the resolution of complex litigation, and is fair and eq-

uitable and in the best interest of the Debtors, their estates, Creditors, and Shareholders.

The settlements reflect a reasonable balance of the risk and expense of litigation against the benefits of early resolution of the disputes and issues addressed by each settlement.

All the settlements, as set forth in the Plan, and various attachments, are in the best interests of the Debtors' estates and its creditors, and are well within the range of reasonableness.

## XI.

### The Distribution of Plan Securities Is Exempt from Any Applicable Registration Requirements Under § 1145 of the Bankruptcy Code

The offer or issuance, sale, exchange, or other transfer of any security under the Plan or the Confirmation Order is exempt from the provisions of § 5 of the Securities Act of 1933 (15 U.S.C. § 77e) and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, under § 1145 of the Bankruptcy Code.

## XII.

### The Distribution of Plan Securities Is Governed by the Exemption Provided in § 1146(c) of the Bankruptcy Code

The offer or issuance, sale, exchange, or other transfer of any security under the Plan is not subject to taxation under any state or local law imposing a stamp, transfer or similar tax in accordance with § 1146(c).

## XIII.

### The Plan Satisfies the Requirements of § 1129(a)(1) of the Bankruptcy Code

We find and conclude that the Plan satisfies all the applicable provisions of the Bankruptcy Code, and, as required by F.R.Bkrtcy.P. 3016(b), the Plan is dated and identifies the Plan Proponents.

## XIV.

### The Plan Proponents Have Satisfied the Requirements § 1129(a)(2) of the Bankruptcy Code

Section 1129(a)(2) requires the Plan Proponents to comply with all the applicable provisions of the Bankruptcy Code.

The Debtors have complied with all the provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, and all other matters considered by us in connection with these Chapter 11 Cases.

## XV.

### The Plan Satisfies the Requirements of Section 1129(a)(3) of the Bankruptcy Code

Under § 1129(a)(3) the Plan has been proposed in good faith and not by any means forbidden by law. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the formulation of the Plan. The Plan is based on extensive arm's length negotiations between and among the Plan Proponents and their legal and financial advisors.

The fact that the Plan has been accepted overwhelmingly by all classes of Impaired Creditors, and 2 out of 3 Classes of Equity Interests, demonstrates the determination of Creditors and Equity Interest holders that the Plan is in their best interests and maximizes distributions available to them.

On the basis of the evidence presented at the Confirmation Hearing, we find and conclude that the Plan has been proposed with the legitimate and honest purpose of reorganizing the Debtors' business affairs and to maximize the returns available to Creditors.

In light of all the circumstances, the Plan was proposed in good faith.

Finally, the issuance of CBI–A's, CBI–C3's, and DPI–A's to or on account of the Profit Sharing Plan and Stock Bonus Plan

shall not constitute a prohibited transaction within the meaning of 26 U.S.C. §§ 401, *et seq.*

## XVI.

### The Plan Satisfies the Requirements of § 1129(a)(4) of the Bankruptcy Code

Under § 1129(a)(4), all payments made or to be made by the Debtors or by a Person issuing securities or acquiring property under the Plan for services, or for costs and expenses in, or in connection with, these cases, or in connection with the Plan and incident to these cases, have been approved by or are subject to our approval as reasonable.

During the course of these Chapter 11 Cases to date, we have approved the interim payments by the Debtors of costs and expenses of professionals [11] retained with Court approval in each respective case; incentive compensation, if any, payable to employees of the Debtors upon successful implementation of the Plan will be approved by the U.S. District Court.

Interim payments to professionals remain subject to review and approval by the Court upon final application under §§ 327, 328, 330, 331, 503(b), or 1103.

## XVII.

### The Plan Satisfies the Requirements of § 1129(a)(5) of the Bankruptcy Code

Under § 1129(a)(5)(A), the Debtors have disclosed in the Disclosure Statement and in evidence presented at the Confirmation Hearing, to the extent known as of the Confirmation Hearing, the identity of the individuals who will hold positions with the Debtors or their successors after confirmation of the Plan, and have shown that the service of such individuals is consistent with the interests of creditors and equity security holders and with public policy.

Under § 1129(a)(5)(B) of the Bankruptcy Code, the Debtors in the Disclosure Statement and in evidence presented at the Con-

firmation Hearing have disclosed, to the extent known as of the Confirmation Hearing, the identity of any insider that will be employed or retained by the reorganized Debtor and successor entities to the Debtors, and the nature of any compensation for such insider.

## XVIII.

### § 1129(a)(6) of the Bankruptcy Code Is Not Applicable to the Plan

The Plan does not provide for change in any rates that require regulatory approval.

## XIX.

### The Plan Satisfies the Requirements of § 1129(a)(7) of the Bankruptcy Code

Section 1129(a)(7) requires each creditor or equity holder in an impaired class to accept a plan or receive or retain under a plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Debtors have presented evidence that the value of distributions to each Creditor in a Chapter 7 liquidation scenario is substantially less than the value of distributions to each Creditor under the Plan.

The recovery and liquidation asset values set forth in the Financial Appendix to the Disclosure Statement, as further adjusted by evidence presented at the Confirmation Hearing, indicate that the assets available for distribution under the Plan exceed the value of the assets in a liquidation under Chapter 7.

The liabilities likely to be established in a subsequent liquidation in Chapter 7, as such liabilities are set forth in the Disclosure Statement, as further adjusted by evidence presented at the Confirmation Hearing, indicate that the liabilities in a liquidation scenario substantially and materially

11. The professionals retained in these Cases have, with rare exception, provided exemplary services to their clients and these Cases.

exceed the liabilities of the Debtors under the Plan.

Based on the evidence presented at the Confirmation Hearing, we find that all impaired classes will receive at least as much under the Plan as they would under a Chapter 7 liquidation. Accordingly, the Plan satisfies the "best interest of creditors" test under § 1129(a)(7) of the Bankruptcy Code.

## XX.

### The Plan Satisfies the Requirements of § 1129(a)(8) of the Bankruptcy Code

Section 1129(a)(8) requires that with respect to each class of claims or interests— (A) such class has accepted the plan; or (B) such class is not impaired under the plan.

Each of the unimpaired classes of Claims and each holder of a Claim or Equity Interest in each such Class is conclusively presumed to have accepted the Plan and solicitation of acceptance with respect to each such Class is not required. 11 U.S.C. § 1126(f).

With respect to the Impaired Classes of Claims, all such Classes have accepted the Plan.

With respect to the Classes of Equity Interests, all such Classes have accepted the Plan, except for DBL Group Class 8.

## XXI.

### The Plan Satisfies the Requirements of § 1129(a)(9) of the Bankruptcy Code

The Plan satisfies the requirements of all three subsections of § 1129(a)(9).

As required by § 1129(a)(9)(A), § 3.1 of the Plan provides that, except as otherwise agreed by the holder of a such Claim, each holder of an Administrative Claim that is an Allowed Claim will be paid in Cash in full on the Consummation Date.

As required by § 1129(a)(9)(B), §§ 6.1, 7.1 and 8.1 of the Plan, each holder of a Priority Claim that is an Allowed Claim will be paid in Cash in full on the Consummation Date, subject to the satisfaction of the Withholding Requirement for such Priority Claims that are Compensation Claims.

As required by § 1129(a)(9)(C), § 3.2 of the Plan provides that, except as otherwise agreed by the holder of a Tax Claim and the Debtors or the Trust, as the case may be, each holder of a Tax Claim (other than the IRS) will receive deferred cash payments over a period of six years from the date of assessment of such Claims, having a value, as of the effective date of the Plan, equal to the allowed amount of such Claims with the statutory rate of interest for deficiencies under applicable state and local tax laws on the allowed amount of such Claims from the effective date of the Plan until such Claims are paid in full; *provided, however*, that in the event the Trust terminates prior to payment in full of the allowed amount of such Claim with interest, the unpaid balance of such amount shall be paid in full on or immediately prior to the date of termination of the Trust.

In accordance with § 1129(a)(9)(C), § 3.2 of the Plan provides that the Tax Claim of the IRS shall be paid according to the terms of the IRS Settlement Agreement; *provided, however*, that in the event the Trust terminates prior to payment in full of such claim, the unpaid balance of such amount shall be paid in full on or immediately prior to the date of termination of the Trust.

## XXII.

### The Plan Satisfies the Requirements of § 1129(a)(10) of the Bankruptcy Code

Under § 1129(a)(10), at least one impaired class of claims must accept the plan, determined without including any acceptance of the plan by any insider.

The Plan satisfies § 1129(a)(10) because at least one class of Claims against each of DBL Group, DBL Inc., and DBL Trading that is impaired under the Plan, *i.e.*, DBL Group Class 4, DBL Inc. Class 4, and DBL Trading Class 3 has accepted the Plan, determined without including any acceptance of the Plan by an insider holding a Claim in each of such classes.

## XXIII.

### The Plan Satisfies the Requirements of § 1129(a)(11) of the Bankruptcy Code

Section 1129(a)(11) requires that a plan must be "feasible," that is, if the plan is not a liquidating plan, a Court must determine that a debtor, or its successor under a plan, is not likely to require liquidation or further financial reorganization, except as provided under a plan.

On the basis of the evidence presented at the Confirmation Hearing, we find and conclude that the Debtors and their successors under the Plan are not likely to require liquidation or further financial reorganization, except as provided under the Plan.

## XXIV.

### The Plan Satisfies the Requirements of § 1129(a)(12) of the Bankruptcy Code

Complying with § 1129(a)(12), the Plan provides for the payment, on the Consummation Date, of all fees payable under 28 U.S.C. § 1930.

## XXV.

### The Plan Satisfies the Requirements of § 1129(a)(13) of the Bankruptcy Code

Under § 1129(a)(13) of the Bankruptcy Code, the Plan provides that each holder of a Retiree Benefits Claim that is an Allowed Claim shall be entitled to the payment of such Claim as provided for in any agreement existing as of the petition date of DBL Inc., between such holder and DBL Inc., to the extent and for the duration of the period that DBL has obligated itself to provide such payments, subject to the satisfaction of the Withholding Requirement for such claims for retiree benefits that are Compensation Claims.

12. This Court's conservative estimate of the length of time to complete pending and potential Drexel Litigation is at least 10 to 15 years.

## XXVI.

### The Plan Satisfies the Requirements of § 1129(b) of the Bankruptcy Code

The Plan satisfies the requirements of § 1129(b) because the Plan meets all of the requirements of § 1129(a), except for subsection (8). The Plan does not discriminate unfairly and is fair and equitable with respect to DBL Group Class 8.

## XXVII.

### The Plan Satisfies the Requirements of § 1129(d) of the Bankruptcy Code

The primary purpose of the Plan is not the avoidance of taxes or avoidance of the requirements of § 5 of the Securities Act of 1933. No pleading has been filed by any governmental unit asserting an § 1129(d) objection.

## XXVIII.

### The Release and Injunction Provisions of the Plan are Consistent with §§ 105, 524(e), 1123(a)(5), 1129 and Other Applicable Provisions of the Bankruptcy Code

We have jurisdiction to enjoin and order the release, as provided in the Release and Injunction Provisions, under 28 U.S.C. §§ 1334(a), (b) and (d).

The ability of the Debtors to reorganize and the benefits to Creditors and Equity Interest holders from reorganization are fundamental to the bankruptcy power, especially in confirming and advancing the Consummation of the Plan.

Section 105(a) permits the approval of the release and the issuance of the injunction, as provided in the Release and Injunction Provisions, especially where, as here, the Release and Injunction Provisions are an essential means of implementing the Plan as provided in § 1123(a)(5), confer material benefits on the Debtors' estates, are undoubtedly in the best interest of Creditors and Equity Interest holders and will be instrumental in bringing an end to years [12]

The time value of money, and the emotional and personal costs of the litigation, clearly evinces it is time to end it once and for all. The

of costly litigation over Drexel's activities, while preserving, increasing, and rationally providing for claimants through the provisions of the Plan that channel recoveries into identifiable funds.

On the basis of the evidence presented at the Confirmation Hearing, the Court finds and concludes that it has jurisdiction to approve the Release and Injunction Provisions of the Plan, that such provisions are consistent with §§ 105, 524(e), 1123(a)(5), 1129 and other applicable provisions of the Bankruptcy Code, and that they are in the best interests of the Debtors' estates.

### XXIX.

#### Substantive Consolidation

On the basis of the evidence presented at the Confirmation Hearing, we conclude that the assets and liabilities of DBL Group, DBL GSI, DBL Products, DBL Commercial Paper, DBL MBI, Holdings, BRR, Deauville, DBL Investors, and Double Oil & Gas (DBL Group Consolidating Debtors) are properly consolidated in the Plan, as substantive consolidation of these Debtors is appropriate, necessary, and in accord with the consolidated operation and presentation of the business and activities and other attributes of these Debtors.

On the basis of the evidence presented at the Confirmation Hearing, we conclude that the assets and liabilities of DBL Inc., DBL Asia, DBL Caribe, and DBL International are properly consolidated in the Plan, as substantive consolidation of these Debtors is appropriate, necessary, and in accord with the consolidated operation and presentation of the business activities and other attributes of these Debtors.

Finally, we overrule or deny all objections to confirmation of the Plan and find and conclude that the Plan should be confirmed.

An appropriate Order will be entered.

injunction and release provisions preserve our judicial and social fabric. This is a clear case where society, as a whole, benefits from the "fresh start" provisions of the Code.